C.L. BRIDGES, Jeff Robinson, J.C. Romportl, J.E. Leach, Dillard's Department Stores, City of Houston, Officer M.L. Hogan, Officer P.A. Davis and Officer J.H. Theis, Appellants,

v.

Denise R. ROBINSON, Individually and on Behalf of the Estate of Darryl W. Robinson, Percy Robinson, and Irma Robinson, Appellees.

No. 14–99–00492–CV.

Court of Appeals of Texas, Houston (14th Dist.).

March 30, 2000.

Rehearing Overruled June 15, 2000.

Brock C. Akers, Evelyn T. Ailts Derrington, Kelly Ann Dempsey, Laura Anne Coats, Robert Anthony Armbruster, Michael David Siemer, Houston, for appellants.

Roger Rider, Houston, for appellees.

Panel consists of Justices MAURICE E. AMIDEI, ANDERSON and WITTIG.

## OPINION

DON WITTIG, Justice.

Darryl W. Robinson, deceased, went on a shopping spree which tragically ended at a Houston Dillard's Department Store. An altercation with the store manager turned deadly. The deceased was carted off, hogtied, ribs broken, and placed on Dillard's' curb. There he was pronounced dead.

Appellants advance this interlocutory accelerated appeal of the trial court's denial of their summary judgment motions on the affirmative defense of official immunity. Dillard's' security and law enforcement officers were called to intervene in a dispute the deceased was having with Dillard's manager Kim Wetzel. On-duty Houston Police Officers also arrived later on the scene and assisted Dillard's employees. Robinson died shortly after he and Dillard security guards struggled. The episode ended after the deceased was hogtied by Houston Police and removed to the dock. The primary issue is whether the defendants acted in good faith in subduing, restraining, and monitoring the condition of the deceased. We affirm. We also address whether the prosecution of this second interlocutory appeal was frivolous.

### I. Factual Background

The facts in this case are vehemently contested. We examine the summary judgment proof to determine whether appellants' defenses are established as a matter of law. We must view the TEX.R. CIV. P. 166a summary judgment proof in the light most favorable to appellees, Denise Robinson and the deceased's estate. The record reveals often bizarre and sometimes horrendous proof.

The deceased was a longtime employee of Central Delivery Service. He was married more than sixteen years to Denise Robinson. He was also a longtime customer of Dillard's and had a Dillard's charge card. He had no police record.

On June 1, 1994, the deceased was rendered brain-dead. Earlier that day, the proof shows that the deceased had been in the midst of a shopping spree. He signed a contract to purchase a car. He was to make a $2,000 cash down payment and had withdrawn $2,200 from his bank account. That day he had also purchased two cellular phones at a cost of $500 to $600. He then made several additional purchases at Dillard's department store. According to his widow, the deceased needed an additional $500 cash to meet the down payment for the car. At approximately 8:30 that evening, he went to the fourth floor of Dillard's where he spoke with Alice Lara, the store's customer service representative.

The deceased requested a withdrawal of $500 cash on his ATM card. A dispute developed between the deceased and Lara. Kim Wetzel, a Dillard's manager, intervened. An argument continued for several minutes. Wetzel, according to Marilyn Steltz, another Dillard's employee, had a confrontational nature. Steltz, also a witness, was working about twenty feet away. She could hear the argument from her station but, because of the commotion, left her station several times to visually observe the confrontation. At one point, Steltz testified[1] she heard Wetzel say to the deceased, "Don't you come over that counter." While Steltz did not observe the entire argument she indicated she did not ever see the deceased on the counter.

At about 8:45, two Dillard's salaried security officers on duty, defendants Jeff Robinson and Collier Bridges, came on the scene. Both were also regularly employed by Harris County as sheriff's deputies. The deceased complied with their request to provide identification. The deputies, accompanied by Wetzel, then escorted him to the glass-enclosed back office behind customer service. Shortly after, Steltz heard a commotion from the office and heard the deceased shout, "Are you trying to kill me? You're trying to kill me."

Wetzel then ran out of the office looking for boxing tape. When she found it, she returned to the office. Steltz asked Lara and another Dillard's employee, Shannon Brannagan, what had happened. Both replied that the deceased had wanted $500 and made no mention of the alleged counter incident. Yet another Dillard's employee, Wanda Alexander, said she had observed Wetzel riding the deceased like a "bucking bronco." Steltz then went to the office to see for herself. She saw the deceased on the floor, bound with tape, with Wetzel on top of him, wrapping more tape around his mouth and head. Again, Steltz returned to her station.

The yelling increased. Dillard's Steltz was concerned that something grave was occurring so she again returned to the office. She described the deceased as being in a "very tied down, awkward position" with his face on the floor. Steltz saw blood on the carpeting and the deceased's cheekbones were very pink and bloody and stripped of their skin from apparent carpet burns.

Steltz then observed deputy Robinson on top of the taped deceased, striking him "very, very hard" in the left rib cage. She described Robinson, as a "stockier" man than the deceased, whom she described as "willowy." Steltz shouted at the deputy, known as an acquaintance, "What are you doing?" According to the summary judgment proof, Robinson locked eyes with Steltz and glared at her. Without a word, still staring at Steltz, he struck the deceased three more times.

According to the store's own employee, Steltz, the blows to the deceased's left rib cage were so forceful "that if that man had punched my rib cage like that, this rib cage would be inside this rib cage."

Stating she was "very, very, very much at that point, for the first time in my life, terribly, terribly afraid," Steltz retreated to her station. Asked why, Steltz respond-

1. Summary judgment proof was by deposition testimony unless otherwise indicated.

ed, "I was afraid because I saw law enforcement inflicting the pain."

Defendant Houston Police Department Officer Romportl arrived next and proceeded to the office where the deceased was held. Momentarily, defendant HPD officers Hogan, Theis, and Davis, all of whom were on duty, arrived and went to the office. Shortly after, the deceased was wheeled out of the office, hogtied,[2] on a flatbed dolly. According to Steltz, at that time she saw only HPD officers and one of them was riding on top of the deceased. The deceased was taken to the curb outside of the Dillard's store.

Additional proof and amplification of the events were provided by Dillard's employee, James Turk. Turk stated that when he arrived at the office shortly before 9:00 p.m., he saw Dillard's guard Bridges standing with his "feet in the back of [the deceased's] neck," Dillard's guard Robinson with his knee in the deceased's back, and Wetzel on his legs. Turk noticed a hole in the wall into which it looked like "either somebody had been rammed in the wall or elbow went into the wall or something like that." A blood mark on the wall was alleged to be that of the deceased.[3] Turk noticed the deceased had a lot of "burn marks" on his face and arms from the carpet. Turk also noticed that the deceased was struggling to breathe. Wetzel directed Turk to get more tape.

When Turk returned with the tape two to three minutes later, he observed "foam and stuff" coming out of the deceased's mouth.

In the interim, the HPD officers rehogtied the deceased. While closing the store, Dillard's assistant manager Jeffrey Munzel stated he saw the deceased on the cement with a large wound on his head. Because he was still struggling, five HPD

officers were holding him face down on the cement. The officers were finally able to get the deceased in what Munzel called a "genuine hogtie."

Approximately between 9:15 and 9:30, Steltz and Turk separately went to where the deceased had been transported, the garage outside the south doors of Dillard's. Munzel also observed some of the events outside. Turk stated the deceased was laying on the concrete, face down, still hogtied, with HPD officers standing around. Turk observed something "very unusual" happen with the deceased's body. "That's the first time I ever seen [sic] a body, like, inhale then inhale. I thought that he was going to die." Turk stated that in the few minutes he was there, he did not see any of the HPD officers present check the deceased. When Turk left, he noted that the deceased was still moving.

At about the same time, Steltz was in her car some 60 feet away. For "at least" the fifteen minutes she was there she observed that the deceased's body appeared to be lifeless. During that time she said no one ever checked the man.

At approximately 9:30, the first ambulance pulled up. According to Steltz, the EMT removed a gurney, spoke to the officers for three or four minutes, replaced the gurney, and moved the ambulance out of her field of vision. She said that at no time did the EMT check the deceased. The EMT, Gaspar Guercio, testified that when he arrived, the officers told him the deceased was not breathing.

A second ambulance arrived at 9:38. The EMT, Danny Engle, attempted CPR and injected various drugs into the deceased. At 9:55, he was able to restart the deceased's heart. Munzel on the other

---

2. According to the proof and Houston police procedures, "hogtying" consisted of securing the deceased's hands behind his back to his feet. The back is arched to the rear rendering the person virtually motionless. The person's diaphragm, particularly when positioned face down, may not properly function. This can cause positional asphyxiation, discussed in footnote 5 below.

3. The only blood mentioned in the record was that of the deceased.

hand, stated he returned outside around 9:55, and "they pronounced him dead." The deceased was then taken to Ben Taub Hospital and was placed on life support. Two days later, he was taken off life support, and was again pronounced dead.

One of the experts designated by the Robinson appellees, Dr. Raul Lede, reviewed the medical examiner's data and findings and opined the deceased died of "positional asphyxiation." The asphyxiation was likely to have been brought on by a combination of the hogtying, the awkward positioning of his body, the weight of the officers upon him, fluid in the lungs, his heightened state of anxiety, *inter alia.* Appellees' experts also asserted that broken ribs reported in the autopsy may have been the result of blows sustained by the deceased in the struggle with the officers.

The statements, deposition testimony, and affidavits of the appellant officers and other employees of Dillard's yield radically differing versions of the facts than offered by appellees. Their proof shows a panting, mentally deranged Darryl Robinson came to the Dillard's customer service counter and demanded a million dollars from Lara. When she refused, he jumped on the counter, calling her "demon," badly frightening her. Wetzel then intervened but was further terrorized by the deceased. When the deputies arrived, they claim the deceased was on the counter shouting. In response to what they perceived as possible criminal activity and a potentially dangerous situation, the deputies and Wetzel escorted the deceased to the office. There, the deputies placed the deceased against the wall and attempted to handcuff him. He resisted and they all went to the floor. The deceased became extremely violent, kicking, and spitting, and exhibiting great strength. He was said to be screaming obscenities and bizarre religious and racial epithets. The deputies believed he was on drugs.[4] They eventually handcuffed him but the struggle continued. All three persons trying to subdue the deceased became physically exhausted. The two off-duty HPD officers Leach and Romportl arrived to assist. They resorted to tying, then hogtying, the deceased only because they could not otherwise stop him from fighting them. The force they used was only that which was necessary to contain this very violent actor and was not, they opined, excessive.

Likewise, the on-duty HPD officers who arrived shortly thereafter asserted the police responded only to the extent needed to subdue the deceased. When they arrived, he was still violent and screaming obscenities. They hogtied him only because he was able to break tape and plastic cuffs unsuccessfully used to restrain him earlier. They requested an ambulance as soon as they were able and monitored the deceased's breathing and physical condition the entire time he was in their custody.

## II. Standard of Review

Summary judgment is proper only when the movant establishes there are no genuine issues of material fact and proves he is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c). To be entitled to summary judgment, a defendant must either (1) conclusively negate at least one essential element of each of the plaintiff's causes of action, or (2) conclusively establish each element of an affirmative defense to each claim. *See American Tobacco Co., Inc. v. Grinnell,* 951 S.W.2d 420, 425 (Tex. 1997). In deciding whether there exists a disputed fact issue precluding summary judgment, we treat evidence favorable to the non-movant as true and indulge all reasonable inferences in the non-movant's favor. *See id.* A summary judgment may be based on uncontroverted testimonial evidence of an interested witness, or of an expert witness as to subject matter concerning which the trier of fact must be guided solely by the opinion testimony of experts, if the evidence is clear, positive and direct, otherwise credible and free

---

4. The record reveals the absence of positive drug testing.

from contradictions and inconsistencies, and could have been readily controverted. *See* Tex.R. Civ. P. 166a(c).

### III. Official Immunity

 Appellants' motions for summary judgment were based on the affirmative defense of official immunity. Under Texas law, a defendant seeking a summary judgment on an affirmative defense of immunity must prove, without dispute and as a matter of law, that when the event in question occurred, he or she was: (1) performing a discretionary function, (2) acting in good faith, and (3) acting within the scope of their authority. *See City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex.1994). If any element is not proved as a matter of law or is factually disputed, the summary judgment must be denied. *See id.* If the officer is entitled to official immunity, then the governmental entity employing him retains its sovereign immunity. *See DeWitt v. Harris County*, 904 S.W.2d 650, 653 (Tex.1995).

### A. Discretionary Function of Deputies and Police

Appellees did not respond here or in the trial court to appellants' contentions that the individual defendants were performing a discretionary function. Hence, we do not address this prong.

### B. Course and Scope

 Appellants rely on *Blackwell v. Harris County*, 909 S.W.2d 135 (Tex.App.-Houston [14th Dist.] 1995, writ denied), for the proposition that where an officer is performing a job incident to enforcing the public laws, he is acting in the course and scope of his employment as a police officer even if the employer directed him to perform the duty. However, *Blackwell* also holds that:

> [o]n the other hand, if he was engaged in the protection of the employer's property, ejecting trespassers or enforcing rules and regulations promulgated by the employer, it becomes a jury question

as to whether he was acting as a public officer or as an agent, servant of the employer.

*Id.* at 139 (citing *Glenmar Cinestate, Inc. v. Farrell*, 223 Va. 728, 292 S.E.2d 366, 369–70 (1982)).

In our case, there is ample evidence that Deputies Robinson and Bridges, and HPD Officers Leach and Romportl, were working private, off duty, security jobs when they became involved in the altercation with the deceased. It is unclear if and when these officers assumed a role as public peace officers. What is clear is that the summary judgment proof did not establish this as a matter of law. Therefore, whether at material times these officers were acting in the course and scope of their employment remains a disputed fact issue. *See Blackwell*, 909 S.W.2d at 139.

Conversely, appellees do not dispute that on-duty HPD Officers Theis, Hogan, and Davis were acting in the course and scope of their public duties. That issue is therefore established as to those officers for summary judgment purposes.

### C. Good Faith

 Good faith is the real battleground where this legal engagement is waged. The issue depends on the assessment of a reasonably prudent officer of both the *need* to which an officer responds and the *risk* of the officer's course of action. This assessment is based on the officer's perception of the facts at the time of the event. *See Wadewitz v. Montgomery*, 951 S.W.2d 464, 467 (Tex.1997)(emphasis added). A court must measure good faith in official immunity cases against a standard of objective legal reasonableness, without regard to the officer's subjective state of mind. *Id.* at 466. The need aspect of the test refers to the urgency of the circumstances requiring police intervention. *See id.* Need is determined by factors such as: (1) the seriousness of the crime to which the officer responds; (2) whether the officer's immediate pres-

ence is necessary to prevent injury or loss of life or to apprehend a suspect; and (3) what alternative courses of action, if any, are available to achieve a comparable result. *See id.* The risk aspect of good faith, on the other hand, refers to the countervailing public safety concerns: the nature and severity of harm that the officer's actions could cause, the likelihood that any harm would occur, and whether any risk of harm would be clear to a reasonably prudent officer. *See id.*

Good faith may be established through police expert testimony. *Wadewitz* makes clear that conclusory statements by expert witnesses (that a reasonable officer could have believed that some action was justified) are not enough:

> An expert witness's conclusory statement that a reasonable officer could or could not have taken some action will neither establish good faith at the summary judgment stage nor raise a fact issue to defeat summary judgment. Instead, expert testimony on good faith must address what a reasonable officer could have believed under the circumstances and must be substantiated with reference to each aspect of the *Chambers* balancing test.

*Id.* at 466–67 (citations omitted).

■ Dillard's employees, Harris County Deputies Robinson and Bridges, offer no expert testimony establishing they acted in good faith. Nor were their actions assessed under the requisite "risk/need" balancing test. Given the alleged beating by the deputies and the myriad disputed facts, there patently remains a fact question concerning Robinson and Bridges on the material issue of good faith. *Id.*

■ To prove good faith for the HPD officers, HPD Sergeants Johnson and Stepchinski, filed expert affidavits on behalf of Officers Davis, Hogan, Theis, Romportl, and Leach. Officer Hogan also filed an expert affidavit on her own behalf as well as the other HPD officers. All the police experts assert that hogtying the de-

ceased was appropriate given the magnitude of the deceased's violent behavior and his extremely strong ability to resist the officers and other restraints they had applied. Their proof further states all the HPD officers complied with HPD's policies and procedures on hogtying suspects. The expert officers' affidavits conclude that the HPD officers at all times acted as reasonable and prudent officers under the circumstances.

■ The officers' affidavits discuss at some length the need to hogtie the deceased. However, they fail to sufficiently address testimony about the manner in which the deceased was hogtied, remained hogtied, and was or was not supervised during this time. Simple subjective pronouncements of good faith by a defendant-officer, or by experts supporting the officer's assertions, are insufficient as a matter of law to meet the summary judgment movant's burden of showing good faith. *Geick v. Zigler*, 978 S.W.2d 261, 265 (Tex. App.-Houston [14th Dist.] 1998, pet. denied)(citing *Wadewitz*, 951 S.W.2d at 467). Summary judgment proof is insufficient where the affidavit does not proffer any objective substantiation of the contention a reasonably prudent officer, *under the same or similar circumstances*, could have believed his actions were justified. *See Geick*, 978 S.W.2d at 266 (emphasis added). More specifically, Officers Johnson, Stepchinski, and Hogan do not respond to and ignore at least the following material testimony submitted by appellees in response to the motion for summary judgment:

— After being hogtied, before being taken downstairs, the deceased was at times placed on his abdomen and sat upon by an HPD officer. Foam was coming from his mouth and he was having trouble breathing;

— Downstairs, Turk observed a "very unusual" change in the deceased's condition which led him to believe the deceased was about to die;

— Steltz testified that no one checked the deceased for ten or more minutes prior to the arrival of the first ambulance. Nor did Turk see the officers check the deceased;

— Despite the officers' alleged knowledge the deceased had stopped breathing sometime before the ambulance arrived, no action was taken for at least eight minutes to resuscitate him.

The implications of appellees' summary judgment proof are significant in several ways:

— It created a fact issue whether the HPD officers violated the HPD policy by placing the deceased in a face down position and not closely monitoring his breathing while he was hogtied;[5]

— Though Turk is not a medical expert, he nonetheless observed an alarming change in the deceased's condition indicating he may have been dead or near death. This was seemingly unheeded by the officers at a time when the officers should have been closely monitoring him;

— Steltz's and Turk's testimony that the officers failed to check the deceased squarely controverted their assertion that they were continually monitoring the deceased's breathing and pulse;

— EMT Guercio's statement that he was informed by the officers that the deceased was not breathing upon his arrival, combined with Steltz's statement she saw the police do nothing in the ten or more minutes before he arrived, would permit a jury to infer the officers knew the deceased had not been breathing for some ten minutes, yet took no action;

— We were pointed to no place in the record establishing why the officers allowed critical minutes after Guercio's arrival to pass without taking action to save the deceased's life.

In light of the proof offered by these individual appellees, the contradictory testimony between material fact witnesses, and the inadequate expert affidavits,[6] the officers have failed to meet their burden to conclusively establish good faith. Therefore their official and derivative immunity issues are overruled. *See Wadewitz*, 951 S.W.2d at 466–67.

## IV. Subject Matter Jurisdiction

The City of Houston argues that the acts alleged by appellees do not fall within the Tort Claims Act's limited waiver of immunity, therefore the case against it should have been dismissed for lack of subject matter jurisdiction. Specifically,

---

**5.** Hogtying is not per se against HPD policy. However, HPD in memos and training has warned its officers of the potential dangers of hogtying a suspect, one of which is positional asphyxiation. This is the alleged cause of death in this case. Sergeant Johnson, who trains HPD officers, admitted in his deposition that if hogtying a suspect becomes necessary, in order to avoid positional asphyxiation, the officer should try not to allow the suspect to lay on his abdomen, keep him under observation, and make sure he does not stop breathing. He also issued memoranda to that effect to HPD officers. Officer Hogan also stated an HPD officer is required to "check and/or monitor" the hogtied suspect during the restraint.

In her deposition, Sergeant Stepchinski testified as an expert and fact witness. She

asserted that during her Internal Affairs Division investigation she interviewed numerous people. No one told her that the deceased had been hogtied. When she was then asked in the deposition hypothetically to assume he had been hogtied, on his stomach, not breathing for ten minutes, with nobody doing anything, she was incredulous this could have happened to the deceased. "I can't imagine that an officer would stand there for ten minutes with a person that appears to be passed out and do nothing. I just can't comprehend that they would do that." When pressed, she answered, "I would have a problem with that."

**6.** We note there is no reason the foregoing testimony could not have been addressed in the expert affidavits because it was of record *prior* to the making of the affidavits.

the City argues that (a) TEX. CIV. PRAC. & REM.CODE ANN. § 101.056 protects a governmental unit from liability for its discretionary acts; (b) TEX. CIV. PRAC. & REM.CODE ANN. § 101.055(3) protects it from suit for the method and manner in which it provides police protection; and (c) TEX. CIV. PRAC. & REM.CODE ANN. § 101.057 protects it from liability for intentional torts of its officers.

### A. Discretionary Acts of the City

 The discretionary function exception to the waiver of governmental immunity is designed to avoid judicial review of governmental policy decisions. *See State v. Terrell,* 588 S.W.2d 784, 787 (Tex. 1979). Thus, a governmental entity is immune from liability if an injury results from the formulation of policy. However, a governmental unit is not immune if an injury is caused by the negligent implementation of that policy. *See Terrell,* 588 S.W.2d at 787–88. This distinction is often stated in terms of actions taken at the planning or policy-making level, which are immune, and actions taken at the subordinate or operational level, which are not immune. *See Tarrant County Water Control & Improvement Dist. No. 1 v. Crossland,* 781 S.W.2d 427, 433 (Tex.App.—Fort Worth 1989, writ denied). In this case, appellees did not plead the City was negligent in formulation of policy. Their allegations only pertain to the individual defendants' actions taken at the applied or operational level. Thus section 101.056 is inapplicable.

### B. Method and Manner of Police Protection

 Again the City incorrectly points to a provision that would protect it only from its own formulation of policy, not the officers' implementation of it. *Terrell,* 588 S.W.2d at 788. Appellees did not plead negligence of the City in formulating policy on police protection. As held in *Terrell,* if the negligence causing an injury lies in the formulation of policy, i.e., the determination of the method for providing police protection, the government remains immune from liability. The "method" of performing an act refers to the governmental decision or plan for providing police or fire protection. *Id.* If, however, an officer or employee acts negligently in carrying out that policy, government liability may exist. *Id.* Section 101.055(3) is thus not applicable.

### C. Intentional Acts

 Finally, the City contends that under section 101.057, it is immune from liability for intentional torts of its officers. It essentially contends hogtying and restraining the deceased was an intentional tort in the category of false arrest, imprisonment, and assault, which are, as a matter of law, intentional torts and not actionable under the Tort Claims Act.

 The Restatement Second of Torts defines intent to mean that "the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." RESTATEMENT (SECOND) OF TORTS § 8A (1965). The fundamental difference between a negligence injury and an intentional injury is the specific intent to inflict injury. *See Reed Tool Co. v. Copelin,* 689 S.W.2d 404 (Tex.1985). In this case, appellees only pled that the HPD officers negligently employed hogtie restraints against the deceased which ultimately resulted in his death. The City offers no summary judgment proof that their own officers intended to injure or kill the deceased. The City has not established the appellees' claims as intentional torts, therefore section 101.057 is inapplicable.

This issue is overruled.

### V. Sanctions for Frivolous Appeal Under TEX.R.APP. P. 45

In their brief on the merits of the underlying appeal, appellees asserted that because the existence of material facts in dispute is so obvious, appellants brought

this appeal in bad faith and for the explicit purpose of delaying an upcoming trial setting. Pursuant to Texas Appellate Procedure Rule 45, this court invited appellees to brief their assertions and afforded appellants an opportunity to respond.

### A. Applicable Law

Rule 45 states, in pertinent part: "If the court of appeals determines that an appeal is frivolous, it may—on motion of any party or on its own initiative, after notice and a reasonable opportunity for response—award each prevailing party just damages." TEX.R.APP. P. 45. Whether to grant sanctions is a matter of discretion, which we exercise with prudence and caution, and only after careful deliberation. *See Casteel–Diebolt v. Diebolt,* 912 S.W.2d 302, 306 (Tex.App.—Houston [14th Dist.] 1995, no writ). Although imposing sanctions is within our discretion, we will do so only in circumstances that are truly egregious. *See City of Houston v. Crabb,* 905 S.W.2d 669, 676 (Tex.App.—Houston [14th Dist.] 1995, no writ). Where an appellant's argument on appeal fails to convince the court, but has a reasonable basis in law and constitutes an informed, good-faith challenge to the trial court's judgment, sanctions are not appropriate. *See General Elec. Credit Corp. v. Midland Cent. Appraisal Dist.,* 826 S.W.2d 124, 125 (Tex.1991) (interpreting former TEX.R.APP. P. 84).

In determining whether sanctions are appropriate, we carefully consider the record from the appellant's point of view at the time the appeal was filed. *See City of Alamo v. Holton,* 934 S.W.2d 833, 837 (Tex.App.—Corpus Christi 1996, no writ). Among the factors we consider are whether the appellant had a reasonable expectation of reversal and whether it pursued the appeal in bad faith. *See Tate v. E.I. DuPont de Nemours & Co.,* 954 S.W.2d 872, 875 (Tex.App.—Houston [14th Dist.] 1997, no pet.); *Color Tile, Inc. v. Ramsey,* 905 S.W.2d 620, 624 (Tex.App.—Houston [14th Dist.] 1995, no writ).

### B. Procedural Background

We outline the procedural background of this case to illustrate the context for the acts of certain appellants on this appeal. This case was originally filed in December 1995. It was removed to federal court shortly after and remanded to state court on January 23, 1997. Its initial trial setting was for December 8, 1997. On July 29, 1997, the City filed a plea to the jurisdiction based on lack of actual notice of the claim, which was denied by the trial court. The City first appealed to this court on October 3, 1997. In that earlier appeal, despite a record replete with contradictory proof and three "extensive" separate investigations by the City itself into the tragic death, the City asked us to conclude that as a matter of law, it was not on notice of appellees' claim. Specifically noting that the facts of the case were "highly disputed," another panel of our court affirmed the trial court's denial of the plea. *City of Houston v. Robinson,* No. 14–97–01103–CV (Tex.App.-Houston [14th Dist.] October 22, 1998, no pet.) (not designated for publication), 1998 WL 733906.

By affidavit, appellees' counsel, Roger Rider, states that when the City's earlier plea to the jurisdiction was denied by the trial court in November, 1997, the assistant City Attorney then handling this case, Judith Sanchez, "announced loudly in the courthouse hallways that the City would keep this case tied up on appeals into the millennium." Counsel further swears that the City announced to the trial court at docket call on November 6, 1998 that it would appeal the actual notice decision to the Texas Supreme Court. Accordingly, the November 9, 1998 trial date would have to be postponed. The trial court continued the setting; however, the City failed to make good its word and did not perfect that appeal.

The trial court then set a new trial date of May 17, 1999 and a February 15, 1999 deadline for summary judgment motions. Appellants filed the summary judgment

motions underlying this appeal between January 29, 1999 and February 1, 1999. The motions were denied on April 27, 1999. All appellants gave notice of this appeal between May 6, 1999 and the new trial date of May 17, 1999.

## C. Discussion

### Appellants Robinson and Bridges

■ We first determine whether the appeal of Deputies Robinson and Bridges was frivolous. As noted, neither one of the Dillard's deputies supplied expert testimony on good faith nor did they otherwise marshal sufficient summary judgment proof clearly required by the risk/need balancing test established under *Chambers* and its progeny. In her brief, counsel for these parties acknowledged the requirement of establishing good faith under this test but only endeavored to do so with argument and scant citations to the record. Further, in attempting to establish good faith, she completely ignored the damaging testimony of Steltz and other material witnesses discussed above. This is so even though, taken in the light most favorable to the non-movant, Steltz's and other proof would permit a jury to find Robinson and Bridges were unnecessarily or excessively beating the deceased, and causing or contributing to his demise.

When this court queried counsel why she did not address Steltz's testimony, she acknowledged the facts testified to by Steltz reflected badly upon her clients.[7] She argued, however, their alleged conduct was immaterial under the authority of *Wadewitz* and read the language from the opinion which she asserted supported her contention. Later during argument, it was pointed out that what she had cited as

authority was actually language from the dissenting opinion.[8]

In considering these appellants' point of view at the time the appeal was filed, we observe that the record was well-developed with damaging proof which squarely controverted or significantly undermined their own account of what occurred that night at Dillard's. Counsel admitted she was aware of it and that it looked bad. In this light we believe there was simply no plausible basis for these appellants in good faith to ignore the testimony or to affirmatively represent in their brief that there were no material disputed facts.

We find the deputies' conduct constitutes a frivolous appeal for the following reasons: (1) failure to acknowledge and address extensive contradictory proof; (2) failure to adequately brief the issue of good faith; (3) failure to provide sufficient proof on that issue; and (4) counsel's miscitation of a dissenting opinion as controlling authority. *See, e.g., Tate,* 954 S.W.2d at 875 (inadequate brief held a factor in whether to assess sanctions); *Chapman v. Hootman,* 999 S.W.2d 118, 124–24 (Tex. App.-Houston [14th Dist.] 1999, no pet.)(failure to address evidence a factor); *Parker v. State Farm Mut. Auto. Ins. Co.,* 4 S.W.3d 358, 365 (Tex.App.-Houston [1st Dist.] 1999, no pet. h.)(ignoring summary judgment evidence a factor); *Triland Inv. Group v. Tiseo Paving Co.,* 748 S.W.2d 282, 284–85 (Tex.App.-Dallas 1988, no writ)(misconstruing nature of summary judgment evidence a factor); *A.T. Lowry Toyota, Inc. v. Peters,* 727 S.W.2d 307, 309 (Tex.App.-Houston [1st Dist.] 1987, no writ)(misleading the court [re the record] a factor); *Bradt v. West,* 892 S.W.2d 56, 79 (Tex.App.-Houston [1st Dist.] 1994, writ denied)(turning a "blind eye" to well-established law a factor).

---

7. Counsel contends that in doing so she was being "forthright" with the summary judgment record. We disagree. She in no way attempted to address Steltz's testimony in her good faith analysis in her brief, nor did she address it in oral argument, until the court pointedly asked her to.

8. Counsel forcefully argued that a rule was *binding* on this court when she knew or should have known it was not. In no way did she try to make the court aware the language was from the dissenting opinion until after she was called to task.

In sum, no reasonable attorney could believe this court would reverse the denial of the trial court's summary judgment as to Robinson and Bridges. We therefore hold their appeal is objectively frivolous.

### Appellant Dillard's

■ Because Dillard's appealed on the basis of derivative immunity, its appeal is dependent on the immunity of its employees, Bridges and Robinson. Therefore, the rationale provided in the previous section equally applies here. Further, Dillard's invoked TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(5) in making its interlocutory appeal. This provision, however, is reserved for "an officer or employee of the state or a political division of the state." There is no provision allowing a private company an interlocutory appeal. Because of this, and in light of the total lack of merits of its appeal, we hold there was no good faith basis for Dillard's to file and prosecute this appeal. We therefore find Dillard's' appeal was objectively frivolous.

### Appellant HPD Officers

■ We move to the appeal of the HPD officers, Romportl, Leach, Theis, Hogan, and Davis. Unlike the deputies, the HPD officers provided three expert affidavits employing the risk/need balancing test in attempting to establish good faith. However, like the deputies, the officers and their experts ignored significant damaging testimony about the manner of hogtying and supervision of the deceased in their analysis.

At oral argument, one of the HPD officers' lawyers asserted, in response to our query, that Steltz's testimony was all but ignored in the briefs because she was too far away from the events or was not present at all times when the HPD officers were present. This argument clearly goes to the weight of her testimony, not its competence. This is necessarily a jury argument. A jury is free to discount or even dismiss Steltz's testimony. However, as appellant is aware, an appellate court

examining the propriety of a denial of summary judgment is constrained not to do so. *See Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex. 1996).

There was simply no good faith basis to feign Steltz's and Turk's testimony does not exist. Summary judgment rules require the allegations in non-movant's proof shall be taken as true with every reasonable inference to be resolved in the non-movant's favor.

We believe that no reasonable attorney could conclude this court would reverse the denial of the trial court's summary judgment filed by the HPD officers. We therefore hold their appeal is objectively frivolous. *See Chapman*, 999 S.W.2d at 124–25; *Parker*, 4 S.W.3d at 365; *Tiseo Paving*, 748 S.W.2d at 284–85; *Bradt*, 892 S.W.2d at 79.

### Appellant City of Houston

The City's appeal is predicated, in part, on whether the HPD officers are entitled to immunity, discussed above. It also appealed on independent grounds asserting appellees' claims fell outside the waiver of sovereign immunity. Specifically, a governmental unit retains immunity for (1) its discretionary acts; (2) the method and manner in which it provides police protection; and (3) the intentional torts of its officers.

■ The City claimed that the police officers' method and manner of restraining the deceased was covered by the first two grounds. As discussed, the well-established case law very specifically holds that these provisions protect a governmental unit from formulation of policy, not the officers from their allegedly negligent implementation of it. Despite this, the City nonetheless attempted to couch appellees' claims clearly alleging negligence of the officers as falling within the provisions applying to the governmental units. Equally clear is the absence of any claims against the City that would arguably fall within

the cited provisions. Therefore, we believe no good faith reading of appellees' live pleadings suggest they were claims against the City for its formulation of policy regarding the method and manner of police protection or otherwise. Further, we find no good faith reading of existing case law yields the construction urged by the City. *See Swate v. Crook,* 991 S.W.2d 450, 455 (Tex.App.-Houston [1ˢᵗ Dist.] 1999, pet. denied)(conscious indifference to established law).

 Yet another ground for sanctions is asserted against the City. We now turn to appellees' allegation that the City brought this appeal for purposes of delay. In examining the procedural history of this case, we are careful to distinguish engaging in bad faith delay tactics from the legitimate use of statutory and procedural avenues. Standing alone, we recognize some of the City's acts would not provide grounds for holding it delayed the prosecution of this case in bad faith. For example, there is no per se basis to sanction a party for filing for summary judgment on the last day for doing so in the court's scheduling order. We will not in this instance assess sanctions for conduct prior to or outside this appeal. We will, however, scrutinize all relevant conduct in the record in determining whether such conduct supports our finding this appeal was part of a larger pattern of the use of bad faith delay tactics.

Prior to this appeal, we note three significant occurrences in the history of this case that, along with other factors discussed, lead us to the conclusion the City filed this appeal for purposes of delay. First is the October 1997 interlocutory appeal.[9] Over a year ago, this court affirmed the trial court's denial of the City's plea to the jurisdiction on the issue of whether there existed a fact issue that the City had timely notice of appellees' claim. The City

contended it did not have notice as a matter of law. After observing the facts of this case were "highly disputed," we cited voluminous evidence from numerous sources which showed clearly to the contrary.

Second is the City's announcement to the trial court at docket call that it would appeal this court's decision affirming the denial of the plea to the jurisdiction. This it did not do. However, the announcement itself served to delay that trial date.

Third is appellee's affidavit stating that, after the trial court denied the City's plea to the jurisdiction in 1997, the Assistant City Attorney, proclaimed her intent to keep this case on appeal into the millennium. We find this a very disturbing allegation that directly evidences the City's bad faith intent to delay this case from proceeding. And because of the severity of the alleged misconduct, we would hope if untrue, the allegation would be denied. It was not.

Therefore, for these additional reasons, we hold the City filed an objectively frivolous appeal, did so in bad faith and for purposes of delay. *See Bradt,* 892 S.W.2d at 79.

### Conclusion

A party's decision to appeal should be based on professional judgment made after careful review of the record for preserved error in light of the applicable standards of review. *Chapman,* 999 S.W.2d at 125. In moving for summary judgment and in appealing the denial of it, appellants all but ignored a great deal of damaging material evidence that precluded reversal of the lower court's denial of summary judgment. It is fundamental that the evidence must be viewed in the light most favorable to the non-movant, yet the appellants dismissed these requirements. Instead, ap-

---

9. While we find nothing in the statute to disallow the City two bites at the interlocutory apple, the practice should be discouraged in the interests of judicial economy. Perhaps in light of the obvious abuse in this case, the legislature will take a harder look to the issue of multiple interlocutory appeals.

pellants improperly presented their own version of the facts in a manner resembling jury argument. This conduct evidences a conscious indifference to long-settled principles of summary judgment law. As we stated in *Chapman*, "There is no room at the courthouse for frivolous litigation. When a party pursues an appeal that has no merit, it places an unnecessary burden on both the appellee and the courts. More importantly, it unfairly deprives those litigants who pursue legitimate appeals of valuable judicial resources." *Id.*

We therefore conclude that the filing of this appeal by the City of Houston, Dillard's Department Stores, C.L. Bridges, Jeff Robinson, J.C. Romportl, J.E. Leach, M.L. Hogan, P.A. Davis, and J.H. Theis, warrants the assessment of just damages under Rule 45. Accordingly, we sustain appellees' Motion for Damages and order appellants to pay to appellees and their attorneys $10,000, allotted as follows: City of Houston: $6,000; Dillard's Department Stores: $3,400; Jeff Robinson: $250; C.L. Bridges: $150; J.C. Romportl: $40; J.E. Leach: $40; M.L. Hogan: $40; P.A. Davis: $40; and J.H. Theis: $40. We find these amounts conservatively represent just and reasonable damages. In addition appellants shall pay appellees interest at a rate of ten percent (10%) per annum from the date of this court's mandate until paid in full.

The judgment of the trial court is affirmed.