NO. 12-04-00384-CV
 
IN THE COURT OF APPEALS

TWELFTH COURT OF APPEALS DISTRICT

TYLER, TEXAS
RONALD W. MARTIN AND                             §                 APPEAL FROM THE FOURTH
LONGVIEW TEX N.P., INC. d/b/a
GRAHAM CENTRAL STATION,
APPELLANTS
 
V.                                                                         §                 JUDICIAL DISTRICT COURT OF


ROBERT HUGHES, AND WIFE,
LORI HUGHES,
APPELLEES                                                      §                 RUSK COUNTY, TEXAS
                                                                                                                                                            
MEMORANDUM OPINION
            In three issues, Ronald W. Martin and Longview Tex N.P., Inc. d/b/a Graham Central
Station (“GCS”) appeal the trial court’s denial of their motions for summary judgment based on
the affirmative defense of official immunity.


 We affirm.
 
Background
            On January 18, 2003, Robert Hughes, and his wife, Lori Hughes, arrived at Graham
Central Station, a bar and dance club, in Longview. Martin, an off-duty police officer from the
Tatum, Texas Police Department, was working as a security guard at GCS that evening. Martin
ejected Robert from the club after an altercation with another patron. When Robert was in the
parking lot, that same patron and three to five others yelled threats at him and walked toward
him. Feeling threatened, Robert grabbed a tire tool from behind the seat of his truck. At this
point, Martin drew his sidearm and told Robert to drop the tire tool. Robert claims that he
complied with Martin’s request and dropped the tire tool. According to Robert, he placed his
hands behind his back, then felt a blow to the back of his head and fell to the ground on his
knees. He contends that Martin also kicked him while he was on his knees. 
            Martin’s version of the events that occurred in the parking lot differs greatly from
Robert’s. Martin claims that Robert came toward him, threw the tire tool down, and started
pushing him backward. Martin then stiff-armed Robert with his gun and started pushing Robert
backward. According to Martin, Robert drew his fist back to strike him in the face, so Martin
struck Robert with his weapon. Robert went to the ground on his knees and then tried to tackle
Martin by taking his feet out from under him. Martin then fell on Robert, causing Robert to hit
his head on the pavement. Martin and Robert wrestled for a little longer until a second officer
came to Martin’s rescue. 
            It is undisputed that after the incident between Robert and Martin, the Longview Police
Department arrived at the scene. The LPD did not arrest Robert after the incident.
            Robert and Lori later sued Martin and GCS for personal injury damages, alleging that
Martin was negligent in his use of unnecessary and excessive force and that GCS was negligent
for hiring Martin. Martin and GCS filed motions that asked the trial court to dismiss the case
prior to trial. The motions argued that as a police officer discharging his duty, Martin is entitled
to official immunity from being sued. The trial court denied the motions.
            Martin and GCS now appeal the trial court’s ruling, arguing that the trial court erred by
refusing to 1) render judgment in their favor on official immunity grounds and 2) strike the
affidavit of Chuck McDaniel, the Hugheses’ expert witness.


 Robert and Lori argue that the trial
court did not err by denying their motions.
Did the Trial Court Properly Deny the Motions for Summary Judgment?
            In his first issue, Martin contends that the trial court erroneously denied his motion for
summary judgment because the summary judgment evidence establishes that he is entitled to
official immunity. The Hugheses argue that the trial court properly denied the motion.
Standard of Review
            Ordinarily, a court of appeals does not review the trial court's denial of summary
judgment; however, the Texas Civil Practice and Remedies Code allows an interlocutory appeal
from the denial of summary judgment based on official immunity. Tex. Civ. Prac. & Rem.
Code Ann. § 51.014 (a)(5)(Vernon Supp. 2005). Official immunity is an affirmative defense
that shields governmental employees from personal liability so that they are encouraged to
vigorously perform their official duties. Telthorster v. Tennell, 92 S.W.3d 457, 460-61 (Tex.
2002); Saenz v. Gonzalez, 94 S.W.3d 659, 663 (Tex. App.–San Antonio 2002, pet. denied). 
When a party seeks summary judgment on an affirmative defense, it must prove conclusively all
elements of the affirmative defense. Univ. of Houston v. Clark, 38 S.W.3d 578, 580 (Tex.
2000). No disputed question of material fact can remain on the affirmative defense. Black v.
Victoria Lloyds Ins. Co., 797 S.W.2d 20, 27 (Tex. 1990). To determine whether a disputed issue
of material fact exists, we take as true all evidence favorable to the nonmovant, indulge every
reasonable inference in favor of the nonmovant, and resolve any doubts in the nonmovant's favor.
 Nixon v. Mr. Prop. Mgmt. Co., Inc., 690 S.W.2d 546, 548- 49 (Tex. 1985). A fact is
established as a matter of law if ordinary minds cannot differ on the conclusion to be drawn from
the evidence. Imco Oil & Gas Co. v. Mitchell Energy Corp., 911 S.W.2d 916, 920-21 (Tex.
App.–Fort Worth 1995, no pet.). 
Official Immunity
            The elements of the defense of official immunity are (1) the performance of a
discretionary function, (2) within the scope of the employee's authority, and (3) while performing
that function in good faith. Clark, 38 S.W.3d at 580. In order to establish good faith as a matter
of law, Martin was required to show that a reasonably prudent officer, under the same or similar
circumstances, could have believed that his conduct was justified based on the information he
possessed when the conduct occurred. Tennell, 92 S.W.3d at 465. Martin was not required to
prove that it would have been unreasonable not to engage in the conduct or that all reasonably
prudent officers would have engaged in the same conduct. Id. He was required to prove only
that a reasonably prudent officer, under similar circumstances, might have reached the same
decision. Id. If Martin met that burden, in order to controvert, the Hugheses were required to
do more than show that a reasonably prudent officer could have reached a different decision. Id. 
They were required to prove that no reasonable officer in Martin’s position could have believed
that the facts were such that they justified Martin’s conduct.  Id. If officers of reasonable
competence could disagree on the issue, the officer will be said to have acted in good faith as a
matter of law. Id. 
The Evidence
            At his deposition, Robert stated that on the morning of January 18, 2003, he and Lori
arrived at GCS sometime between 12:15 a.m. and 12:30 a.m. after eating dinner. When they
entered the club, Robert began talking to an acquaintance of his, Danny Doyle, and shook his
hand. According to Robert, Doyle tried to break the index finger on Robert’s left hand while
they were shaking hands. Someone then came over to him and said, “He’s out of here.” Robert
walked out of GCS and waited for Lori to leave. Martin waited with Robert outside GCS. 
Robert stated that he had consumed only one to two beers at dinner and did not drink any
alcoholic beverages at GCS. 
            When Lori exited, “three, four or five guys,” including Doyle, came out of GCS and
began threatening and cursing at Robert while walking toward him. Robert felt threatened by
this conduct, so he grabbed a tire tool from his truck and waved it in the air in the direction of
the approaching men. The men subsequently dispersed, and Robert then heard someone
“hollering” at him. He turned around and saw a person wearing a shirt with “security” stenciled
on the front of it, so Robert dropped the tire tool. He could not tell if Martin had a weapon or
a badge, but when Martin told him to put his hands behind his back, Robert complied with the
request. He then felt a blow to the back of his head and fell to the ground while yelling, “I’m not
resisting, I’m not resisting.” Robert remembered receiving other blows to his head after the
initial hit. He remembered dropping the tire tool, being handcuffed, and receiving a blow to the
head. When he woke up after being hit on the head, he was on the other side of the parking lot,
away from where the incident occurred. 
            Lori testified that when they arrived at GCS, she began to walk around to see if anyone
was there that she knew. She could not remember how long she was there before one of her
friends told her that Robert had been ejected from the club. Lori then walked out the door of the
club and went to Robert’s truck. Both Robert and Lori drove out of the parking lot at GCS and
“drove down the road a little ways” before Lori realized that her wallet was missing. Robert
turned the truck around and went back to the parking lot.
            When they arrived back at GCS, Lori stated that she and Robert got out of the truck and
looked for her wallet near the place they had originally parked. About ten minutes after they
began looking for the wallet, Lori saw Doyle and four others walking toward them, saying that
they were going to “kick [Robert’s] ass.” Robert then retrieved the tire tool from the truck and
swung it at the people in order to scare them away. Lori testified that the men separated and
Doyle ran back into the club. She stated that Martin “and his other two buddies” then came out
of the club and walked toward Robert, who dropped the tire tool. When the men got to Robert,
they handcuffed him and “beat him down.” Lori said that Martin kept threatening to spray
Robert with pepper spray because Robert was trying to resist, which, according to Lori, was
incorrect because Robert was not trying to resist. She said that the people, including Martin, held
Robert down and kept beating him after he had fallen to the ground. 
            After the fight continued for what “seemed like forever” to Lori, she picked up the tire
tool. She stated that Martin then “yanked” the tool from her hand and shook it in Robert’s face
yelling, “This is what got your ass whooped, boy,” and walked off with the tool in hand. The
police arrived at that time and told Martin to go back inside the club.
            To bolster their claims, the Hugheses filed the affidavit of Chuck McDaniel, a former
Houston Police Officer who worked for three years as a security guard at a nightclub while off
duty. McDaniel stated that Martin allowed the initial incident to get out of hand by enforcing
“house rules” and not placing Robert under arrest when he first refused to leave the premises. 
According to McDaniel, an officer never enforces house rules; he only enforces city, county,
state, or federal laws at all times. In his opinion, a reasonable peace officer would have told the
customer one time, while inside the premises, that he had to leave or he would be considered a
trespasser. Immediately upon the customer’s refusal to leave, the customer must be placed under
arrest and handcuffed, if necessary, especially when the customer is disorderly or intoxicated.
            McDaniel noted that Martin’s version of the incident is “inconsistent with the severity
of the injuries suffered by Robert” and is inconsistent with the official police report filed by the
Longview policemen who investigated the incident. McDaniel stated that Martin used excessive
force in attempting to control Robert because Robert responded to Martin’s initial commands
to drop the tire tool. In McDaniel’s opinion, a reasonable peace officer would not have drawn
his weapon under those circumstances, but “rather would first have attempted the use of an
alternative lesser force such as use of pepper spray or assistance of additional peace officers or
business employees in the vicinity.”
            At his deposition, Martin testified that on the evening of the incident at issue, a manager
at GCS called him into the club via radio and saw that the manager was arguing with Robert. 
The manager pointed his finger at Martin and, referring to Robert, said, “He’s got to go.” Martin
did not know why Robert was being ejected from the club, but Martin told Robert that he would
have to step outside. Robert then looked at Martin and said, “If I’ve got to go, then the other
motherf**ker has got to go, too.” Martin stated that Robert hit the door hard, went out to the
parking lot, and began verbally berating Martin. Martin advised Robert that he was not a security
guard but was a peace officer and asked him to “please lower [his] conduct because at this time
[his] conduct [was] disorderly.” Robert threatened to “kick [Martin’s] ass,” and Martin replied,
“ Sir, you need to settle down.” 
            Martin said that Robert then walked over to the entrance of GCS and proceeded to go
through the motions of urinating. Martin told him not to urinate on the building and that if he
did, Martin would “call Longview P.D. and [he would] go to jail.” Robert again told Martin that
he would “kick his ass,” and Martin again said, “Sir, settle down. Your conduct is disorderly.” 
Martin then told Robert that he was criminally trespassing and not to come back onto the GCS
property. Martin also went inside the club and told a cashier to call the Longview Police
Department. 
            Martin stated that at that time, Lori came out of the building and became “very
combative.” Robert and Lori then walked away from Martin, and Martin walked back inside the
club. Martin believed that Robert was intoxicated, but did not know whether Lori was
intoxicated. 
            About an hour later, Martin walked out of the club and saw Robert striking another male
in the back with a piece of pipe. Martin positioned himself between the two men and told Robert
to put the pipe down. Robert then raised the pipe and walked toward Martin, who then pulled
out his service weapon, a double-action automatic pistol. Martin pointed the weapon at the
ground and told Robert to put the pipe down and get on the ground. Martin stated that Robert
came toward him, threw the pipe down, and pushed him backwards. Martin tried to holster his
weapon, but could not find the holster. He “stiff-armed” Robert with his weapon in his right
hand and pushed Robert back with his left hand. Robert then drew back a fist, so Martin put up
his left hand to block the punch. Martin stated that when he put up his left hand, he struck
Robert in the head with his weapon. Martin eventually found his holster and holstered the
weapon, at which time Robert tried to “take [Martin’s] feet out from under” him. Martin threw
his weight on top of Robert, thus causing him to fall down on the pavement on his head. Robert
tried to get up a second time, and Martin put his weight on top of Robert again, which caused
Robert to fall to the pavement and strike his head on the ground. 
            Jeremy Sanger, a manager at GCS, and Russell Smith, another peace officer working
security at GCS, came over to help Martin subdue Robert. As they restrained Robert, Martin saw
Lori pick up the pipe and attempt to hit him. Martin stated that “one of the floor men” then
grabbed Lori and took the pipe from her. 
            Police officers from the Longview Police Department arrived at the scene, and Martin
began filling out a “probable cause and complaint.” Martin claims that a Longview police
sergeant appeared and did not ask him to give a “full report.” Martin stated that this sergeant
“had applied one time [at the] Tatum Police Department and didn’t get hired, [he was] very
disgruntled at us,” “doesn’t like Tatum Police Department,” and “wasn’t skilled in the proper
training to know if [they were] police officers or security officers.” He also claimed that the
sergeant “spent more time with the Hugheses than they actually did with [him].” Martin was
very dissatisfied with the quality of the investigation by the Longview Police Department.
            Martin testified that Robert refused treatment from the emergency personnel at the scene
and then he and Lori got into their vehicle and drove away. Martin believed that Lori was too
intoxicated to drive and “personally wouldn’t have let her drive a motor vehicle.” 
Analysis
            The principal element of the official immunity defense at issue in this case is whether
Martin acted in good faith on the morning of January 18, 2003. The record reflects numerous
conflicting versions of the incident between Robert and Martin. Even the Texas Alcoholic
Beverage Commission report compiled after an investigation of the incident notes that “all
accounts of the night of 1-17-2003/1-18-2003 are different depending on which party [the
investigator] spoke to.” Texas jurisprudence mandates that a movant on summary judgment fails
to conclusively establish good faith when the material facts relied on to support good faith are
in dispute. See Adams v. Downey, 124 S.W.3d 769, 774 (Tex. App.–Houston [1st Dist.] 2003,
no pet.) (holding that parties’ contradictory versions of underlying event precluded summary
judgment in favor of officer); Kistner v. Pfannstiel, 107 S.W.3d 7, 11-12 (Tex. App.–San
Antonio 2002, no pet.) (holding that summary judgment improper on good faith ground when
contradictory proof introduced as to whether officer was justified in arresting plaintiff); Bridges
v. Robinson, 20 S.W.3d 104, 112-13 (Tex. App.– Houston [14th Dist.] 2000, no pet.) (holding
that officers’ expert affidavits that addressed their own version of facts and ignored contradictory
and other damaging proof failed to establish good faith); City of Dallas v. Aguirre, 977 S.W.2d
862, 864 (Tex. App.–Dallas 1998, no pet.) (holding officer could not establish good faith when
factual dispute existed on whether plaintiff was fleeing police). We therefore leave to the fact
finder the determination of whether Robert’s or Martin’s version of the facts is the correct one. 
Adams, 124 S.W.3d at 774. In that respect, our job is easier than that of the fact finder because
we must take Robert’s assertions on material facts as true and indulge all inferences from that
evidence in his favor. Id. Because the material facts relied on to support good faith are in
dispute, and since we must take Robert and Lori’s version of the facts as true, Martin has not
conclusively proven his good faith, specifically, that a reasonably prudent officer, under similar
circumstances, might have taken the same action he took after Robert dropped the pipe in the
parking lot of GCS. Martin’s first issue is overruled.
            Martin’s remaining issues address summary judgment evidence filed by the Hugheses in
support of their response to Martin’s motion for summary judgment. We have held that Martin
did not meet his initial burden of proof on the affirmative defense of official immunity; therefore,
we need not consider his remaining issues regarding the Hugheses’ evidence. See Tex. R. App.
P. 47.1.
Conclusion
            Martin and GCS failed to conclusively establish that Martin acted in good faith when he
confronted Robert in the parking lot of GCS; therefore, the trial court did not err by denying his
motion for summary judgment on official immunity grounds.
            The judgment of the trial court is affirmed.
 
                                                                                                    DIANE DEVASTO 
                                                                                                                 Justice
 
 
Opinion delivered November 30, 2005.
Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
(PUBLISH)