Maya ANGELOU, Appellant,

v.

**AFRICAN OVERSEAS UNION, Appellee.**

**No. 14–00–00004–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 24, 2000.

Rehearing Overruled Nov. 16, 2000.

Melvin Houston, Houston, for appellants.

Clay Crawford, Houston, for appellees.

Panel consists of Chief Justice MURPHY and Justices WITTIG and FROST.

## OPINION

DON WITTIG, Justice.

The former poet laureate of the United States essays the district court's ruling finding personal jurisdiction over her in Texas. We first determine whether her Rule 11 agreement extending the answer date, filed with the court, constitutes a general appearance. We hold it does not. We then address whether appellant, who expressly agreed to appear in Texas to accept a prestigious award, but refused to do so knowing of appellee's elaborate preparations, subjected herself to the jurisdiction of Texas courts. We hold she has. We accordingly affirm the trial court's denial of her special appearance.

### Facts

Appellant, Maya Angelou, is a celebrated poet, author, and a professor at Wake Forest University. Appellee, African Overseas Union (AOU), is a non-profit organization. On June 29, 1998, Nosa Ajayi of AOU called Angelou at her home in North Carolina. On behalf of AOU, Ajayi offered to bestow the Order of Kilimanjaro award upon Angelou in Houston. The award was to be for Angelou's "lifetime of contributions to African culture in America." Angelou asked how elaborate the award ceremony would be. Ajayi replied that the presentation of the award is "very similar to the coronation of a chief in Nigeria." Angelou asked how long the ceremony would last. Ajayi told her it would be two to three hours. Regarding its proposed plans for the event, Ajayi also told Angelou that:

— AOU wanted to have a book-signing session, a luncheon, and a dinner leading up to the award ceremony.

— The "whole evening's affair will be focused on our presentation ceremony."

— AOU would specially prepare an outfit and shoes in which Angelou would receive the award.

— AOU would present Angelou with a "specially carved staff from Nigeria"

— AOU was considering flying in a previous recipient of the award for the ceremony.

Angelou told Ajayi that December 5, 1998 would be a good date because she had already planned to be in Houston two days precedent to speak at a fundraiser hosted by Living Bank, a non-profit organization dedicated to organ donation. Through her booking agent, Angelou had contracted with Living Bank approximately three months earlier to speak at its fundraising event for approximately $35,000. Angelou stated she would tell her secretary about the AOU award date to avoid any conflict. Ajayi asked Angelou if she would have any special needs. Angelou stated that because she had a severe allergy to seafood, it should not be served at the award ceremony dinner. Angelou gave Ajayi her address and told Ajayi to send her as much information as he could, and mark the envelope "personal." Ajayi then stated he would like to have a letter of confirmation from Angelou.

On July 1, 1998, Ajayi sent Angelou a letter which opened with the request that she send a formal letter of acceptance to receive the award on December 5, 1998 in Houston. The letter reiterated that preparations for the award ceremony would be elaborate. In that connection, he informed Angelou the ceremony would include traditional African rituals from the Palace of Alafin of Oyo and that a traditional dance troupe would be flown in from outside the United States. The letter requested Angelou advise of "any special requests or needs such as hotel(s) of choice, a personal assistant, etc." It closed repeating AOU's request for Angelou's letter of acceptance.

On July 8, 1998, Ajayi called Angelou again. Angelou acknowledged she had received Ajayi's letter. She asked that he send her an "itinerary" of the events. She also instructed Ajayi to call her secretary

to get a publicity photo and biographical sketch for AOU to promote the event. Angelou said she would review the itinerary and let Ajayi know about the book signing and the luncheon in her letter of acceptance. Ajayi then sent Angelou a proposed itinerary which detailed events involving Angelou over a period of two days. The letter stated that the itinerary was tentative and that Angelou should feel free to make any changes. Once again, Ajayi's letter closed that AOU was awaiting Angelou's formal letter of acceptance.

On July 21, 1998, Angelou's employee, on behalf of Angelou, wrote AOU, in pertinent part:

> Dr. Maya Angelou thanks you for the offer to bestow upon her the esteemed and prestigious Order of Kilimanjaro at the African Traditional Award ceremony of commendation in Houston on Saturday December 5, 1998.
>
> It brings me great pleasure to inform you that Dr. Angelou would be honored to accept this award. Please find a biographical vita and a photograph to be used in your commemorative program book.[1]

After receiving the letter, AOU began preparations for the ceremony and events surrounding. AOU also commenced selling tickets and soliciting patrons for the events. There were no contemporaneous discussions of ticket sales, payment of a monetary honorarium, or other financial matters between AOU and Angelou.

On August 19, 1998, Ajayi called Angelou to inquire about whether she would do the book-signing and the luncheon which she had earlier told Ajayi she would address in her acceptance letter. Angelou apologized for failing to do so and promised to get back to Ajayi with her decision. Ajayi mentioned to Angelou the event was going to be well-publicized and that it was getting a good response from the people of Houston.

In early September, Ajayi tried to telephone Angelou at her home and office but did not meet with success. Shortly after, Ajayi reached Angelou. She told him that he she was tired of his calls. When Ajayi began talking about an interview on local television, she told him she was not interested in a television appearance, nor would she do a luncheon or book-signing. She stated she was only interested in receiving the award and leaving Houston. Angelou said "she had a business to run" and that she would appreciate Ajayi's minimizing his calls to her.

Later in September, Bruce Conway, president of the Living Bank, called Ajayi expressing concern the AOU award ceremony would conflict with its event. After some discussion, AOU agreed to help publicize Living Bank at the AOU award ceremony. On September 18, Angelou's booking agent, David LaCamera, wrote a letter to Conway which ostensibly confirmed that agreement. Angelou stated in her deposition that it was about this time that she and LaCamera first found out that AOU was publicizing that Angelou would speak at the event and that it was selling tickets.[2] Angelou stated that she decided not to appear at the AOU event for this reason. However, it was not until December 1, approximately two-and-a-half months later, and only a few days before the award ceremony, that Angelou's office faxed Ajayi a letter notifying AOU that "due to conflicts with her contracted agreements," Angelou would not appear. The award ceremony was never held.

AOU then sued Angelou for breach of contract to recover its costs of preparation

---

1. Angelou characterizes the content of the letter as her employee's own "poetry." She does not, however, dispute the employee acted as her agent nor contend that she did not authorize her to send a letter of acceptance.

2. There are no details in the record about specifically what type of talk AOU was publicizing Angelou was to give at the ceremony. We note there is nothing in the itinerary AOU sent to Angelou or in their discussions in the record that indicates AOU wished Angelou to give a talk.

for the event. Pursuant to Angelou's counsel's request, counsel for AOU agreed by Rule 11 letter to "an extension of the Answer deadline." The agreement was drafted and filed with the court by Angelou's counsel. It was Angelou's first filing with the court. The agreement contained no mention of a special appearance by Angelou; however, Angelou later filed her special appearance, the subject of this appeal, with her answer.

The court later denied Angelou's special appearance, ruling that Texas courts had both specific and general jurisdiction over her. It also found that the filed Rule 11 letter did not waive Angelou's special appearance. The court filed findings of fact and conclusions of law, which are reflected, in part, in the factual summary above.

### Effect of Rule 11 Agreement

■ We will first address AOU's cross-point. AOU claims that Angelou's having procured the Rule 11 agreement extending the answer date and filing that letter with the court constitutes a general appearance, thus she waived her special appearance. A defendant enters a general appearance: (1) whenever it invokes the judgment of the court on any question other than the court's jurisdiction; (2) if its act recognizes that an action is properly pending; or (3) it seeks affirmative action from the court. *See Dawson–Austin v. Austin*, 968 S.W.2d 319, 322 (Tex.1998). However, an act of a defendant may nonetheless have some relation to the cause without constituting a general appearance. *Id.*

*Dawson–Austin* discusses what constitutes "seeking affirmative action" in the context of a special appearance. In that case, the defendant filed several motions in the same instrument with, or subsequent to, her special appearance. One of the subsequently filed motions requested a continuance on the hearing for special appearance and was not made subject to the special appearance. The supreme court held that the motion did not constitute a

general appearance because the motion merely asked the court to defer action on all matters, thus it was not inconsistent with the defendant's assertion that the court lacked jurisdiction. *Id.* at 323.

AOU claims that Angelou's filing of the Rule 11 agreement was an act that both sought affirmative action from the court and recognized its action as properly pending. In support, AOU cites Texas Rules of Civil Procedure 238 and 239. Rule 238 provides:

> On the appearance day of a particular defendant and at the hour named in the citation, or as soon thereafter as may be practicable, the court or clerk in open court shall call, in their order, all the cases on the docket in which such day is appearance day as to any defendant, or, the court or clerk failing therein, any such case shall be so called on request of the plaintiff's attorney.

Tex.R. Civ. P. 238. Rule 239 provides, in relevant part: "Upon such call of the docket, or at any time after a defendant is required to answer, the plaintiff may in term time take judgment by default against such defendant if he has not previously filed an answer . . . ." Tex.R. Civ. P. 239.

AOU posits that, under Rule 238, the trial court is "commanded" to call the docket on Angelou's answer date. However, because Angelou's Rule 11 agreement "asked" the court to delay that date, she both sought affirmative action from the trial court and recognized the action as properly pending. Under Rule 239, AOU argues that in the absence of the Rule 11 agreement, the trial court had the "power" to take a default judgment against Angelou on her answer date. But, by filing the agreement and thus, as AOU puts it, "seeking protection from default judgment," Angelou recognized the action as properly pending and sought affirmative relief. We disagree with these contentions.

First, we would not characterize, as AOU does, Rule 238 as a "command" that the trial court call the docket on answer day. While the rule provides for the court or clerk to call the docket, it also contemplates the contrary by allowing the plaintiff's attorney to request the docket call. Thus, in the absence of a legitimate request by a plaintiff, we do not perceive the trial court as being compelled to take action under Rule 238 in response to the filing with it a Rule 11 agreement merely extending the answer date. If plaintiff had agreed to extend the answer date, any request to prematurely call the docket would certainly not be a legitimate one. Rule 239 also requires no action from the trial court in response to filing a Rule 11 agreement extending the answer date. Rather, the plaintiff must move for default judgment.

We also note that the relevant inquiry concerning a defendant's waiver of a special appearance, is not what a court does in response to a filing, as AOU seems to imply with its arguments under Rules 238 and 239. Rather, the pertinent inquiry is whether a defendant truly seeks any affirmative action from the court. *Id.* at 322. It is significant, then, that there is no precatory language in the Rule 11 agreement at issue. Angelou sought an extension of the answer date from AOU, not the court. AOU agreed to the extension. In turn, Angelou was required to file the agreement with the court for it to be enforced. *See* TEX.R. CIV. P. 11; *see also Padilla v. LaFrance*, 907 S.W.2d 454, 461 (Tex.1995) (Rule 11 requires that agreement be filed before it may be enforced). Thus, contrary to AOU's claims, Angelou did not seek affirmative action from the court by "asking" it not to call the docket, nor did it do so by "requesting" the court "protect it from default judgment" (other than perhaps impliedly requesting the court to hold AOU to its agreement should it attempt to rescind or breach the agreement.) Even if the agreement in some incidental manner somehow called for the court to take or refrain from some sort of action, at most it only "asked" the court "defer any action it might have otherwise taken." This, the *Dawson–Austin* court held, did not constitute a general appearance. *Id.* at 323. We therefore hold the Rule 11 agreement did not seek affirmative action from the court.

AOU also claims the filed Rule 11 agreement constituted a general appearance because the filing recognized the action as properly pending. This contention is marginally true in a very confined sense. However, we do not agree that the actions taken show a recognition that AOU's action is properly pending within the contemplation of *Dawson–Austin* and the cases leading up to it. If Angelou's Rule 11 agreement recognizes AOU's lawsuit is properly pending, it is only in that she tacitly acknowledges that she has to somehow respond. The carefully crafted Rule 11 agreement does no more than extend the answer *date*.[3] Hence, it does not in any way limit what responsive pleadings she may file when the answer date arrives. To read into this Rule 11 agreement that Angelou acknowledged that she was subject to the court's jurisdiction for all purposes, is a sesquipedalian stretch.

For these reasons, we hold Angelou's Rule 11 agreement did not constitute a general appearance and therefore overrule AOU's cross-point.[4]

**3.** The body of the letter of the letter, in its entirety, reads:

This will confirm our telephone conversation of this date, wherein you have agreed to grant an extension to the answer deadline, in the above-styled and numbered cause, to August 18, 1999.
If your understanding of our agreement is the same as that outlined, please sign this letter where indicated below and fax it back to me so that I may file it with the Court. Thank you for your cooperation in this matter.

**4.** We also note, one of the very purposes of a Rule 11 agreement is to facilitate the professional and amicable disposition of issues. It seems unseemly to use such an agreement as a sword to attempt to sever rights of the

### Specific Jurisdiction

Angelou argues the court erred in denying her special appearance based on specific jurisdiction because she did not enter into a contract with AOU.

■ We begin with the presumption that the court has jurisdiction over the parties. *See Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex.1985). Further, it is the defendant's burden to negate all bases for jurisdiction. *See National Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 772 (Tex.1995).

■ The scope of review of a ruling on a special appearance includes all evidence in the record. *See Vosko v. Chase Manhattan Bank, N.A.,* 909 S.W.2d 95, 99 (Tex.App.-Houston [14ᵗʰ Dist.] 1995, writ denied). The existence of personal jurisdiction is a question of law. *See B.H.P. de Venezuela a/k/a B.H.P. Veneca v. Casteig,* 994 S.W.2d 321, 326 (Tex.App.-Corpus Christi 1999, pet. denied). However, to resolve a question of personal jurisdiction, the district court often must resolve underlying factual disputes. *See Dowelanco v. Benitez,* 4 S.W.3d 866, 870 (Tex.App.-Corpus Christi 1999, no pet. h.). We review the resolution of these factual disputes under an ordinary sufficiency of the evidence standard. *See Smith v. Lanier,* 998 S.W.2d 324, 329 (Tex.App.-Austin 1999, pet. denied). The appeals court may not disregard findings of fact if the record contains some evidence from which inferences may be drawn, or unless the findings are so contrary to the overwhelming weight of the evidence as to be manifestly wrong. *See Conner v. ContiCarriers and Terminals, Inc.,* 944 S.W.2d 405, 411 (Tex. App.-Houston [14ᵗʰ Dist.] 1997, no writ); *Hotel Partners v. KPMG Peat Marwick,* 847 S.W.2d 630, 632 (Tex.App.-Dallas 1993, writ denied). Additionally, if the evidence supports an implied finding of fact, we must uphold the district court's judgment on any theory supported by the evidence.

*See Fish v. Tandy Corp.,* 948 S.W.2d 886, 892 (Tex.App.-Fort Worth 1997, writ denied).

■ For a Texas court to exercise jurisdiction over a nonresident defendant, the Texas long-arm statute must authorize the exercise of jurisdiction, and the exercise of jurisdiction must be consistent with federal and state due-process guarantees. *See Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990). The long-arm statute authorizes jurisdiction over a nonresident defendant (1) where the nonresident contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in Texas, and (2) where the nonresident commits a tort in whole or in part in Texas. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997). The statute also permits the exercise of personal jurisdiction where the nonresident is "doing business" in Texas by "other acts." *Id.* The broad language of the statute's "doing business" requirement permits the statute to reach as far as the federal constitutional requirements of due process will allow. *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex. 1991).

■ To comply with the federal constitutional standard, Texas uses the following test: (1) The nonresident defendant must purposefully do some act or consummate some transaction in the forum state; (2) the cause of action must arise from, or be connected with, the act or transaction; and (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of

parties. Still, appellee's counsel contended he was ambushed when his cordial extension

of time occasioned both the dilatory plea and this interlocutory appeal.

the situation. *See Schlobohm*, 784 S.W.2d at 358.

■■■ The first prong of the jurisdictional analysis is to determine whether the nonresident defendant "purposefully" established "minimum contacts" with the state. *See Guardian Royal*, 815 S.W.2d at 230. In establishing minimum contacts, a court may have "general" or "specific" jurisdiction over the defendant. *Id.* General jurisdiction exists where the defendant has maintained continuous and systematic contacts with the forum state so that it is amenable to all suits there. *Id.* Specific jurisdiction exists where the injury to the plaintiff arises out of the minimum contacts with the forum state. *Id.* Specific jurisdiction may arise without the nonresident defendant setting foot upon the forum state's soil or may arise from the commission of a single act directed at the forum. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). If a cause of action arises from or is related to the nonresident defendant's contacts with state, a case for exercising jurisdiction over a nonresident defendant will be much more compelling. *See Beechem v. Pippin*, 686 S.W.2d 356, 361 (Tex.App.-Austin 1985, no writ).

■■■ In a hearing on a special appearance motion, a trial court should not reach the merits of the case. *See Portland Savings & Loan Ass'n v. Bernstein*, 716 S.W.2d 532, 535 (Tex.App.-Corpus Christi 1985, writ ref'd n.r.e.).

■■■ The parties appear to agree that the only basis for specific jurisdiction over Angelou would be the contract prong of section 17.042. Angelou offers several arguments in support of her contention that she had negated the existence of a contract in her special appearance. She cites the elements that are generally required to create an enforceable contract:

(1) An offer;

(2) Acceptance in strict compliance with terms of the offer;

(3) A meeting of the minds;

(4) A communication that each party has consented to the terms of the agreement;

(5) Execution and delivery of the contract with an intent that it become mutual and binding on both parties. *See Hallmark v. Hand*, 885 S.W.2d 471, 476 (Tex.App.-El Paso 1994, writ denied); and

(6) Consideration. *See Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496

■■■ The determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did and not on their subjective state of mind. *See Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App.—San Antonio 1999, pet. denied). Unexpressed subjective intent is irrelevant. *Id.* In determining whether mutual assent is present, the court looks to the communications between the parties and to the acts and circumstances surrounding these communications. *See Wiley v. Bertelsen*, 770 S.W.2d 878, 882 (Tex.App.-Texarkana 1989, no writ). The offer must be clear and definite just as there must be a clear and definite acceptance of all terms contained in the offer. *See Gulf Coast Farmers Co-op. v. Valley Co-op Oil Mill*, 572 S.W.2d 726, 737 (Tex.Civ.App.-Corpus Christi 1978, no writ). Where a meeting of the minds is contested, as it is here, determination of the existence of a contract is a question of fact. *See Runnells v. Firestone*, 746 S.W.2d 845, 849 (Tex.App.-Houston [14th Dist.] 1988), *writ denied per curiam*, 760 S.W.2d 240 (Tex.1988). If the factfinder determines that one party reasonably drew the inference of a promise from the other party's conduct, that promise will be given effect in law. *See Copeland*, 3 S.W.3d at 605.

■■■ The trial court made explicit findings of fact that led inexorably to its legal conclusion that a prima facie contract existed between AOU and Angelou. After examining the evidence under each ele-

ment, we find the court's findings are amply supported by the evidence.

*Offer and Acceptance:* In her brief, Angelou contends that AOU "only requested that Angelou respond to its request" that she accept the award, and that "in her response letter, Angelou made no agreement to attend the award ceremony." We disagree. Angelou essentially contends that AOU made no offer to her, only that it "requested a response to its request." However, as outlined above, the evidence shows that AOU quite clearly offered both verbally and in writing to bestow the Order of Kilimanjaro upon Angelou in Houston on December 5, 1998, and provide her with ceremonial attire and gifts, in exchange for her agreement to attend the award ceremony in her honor.

In turn, Angelou's written agreement to come to Houston on December 5, 1998, to accept the award was in direct response to AOU's offer and to its numerous requests that she provide, as AOU unmistakably couched it, her "formal letter of acceptance."

In light of the unambiguous words of AOU's offer and Angelou's corresponding formal acceptance letter, as well as her numerous communications with Ajayi that led up to it, Angelou's contentions that there was no discernable offer and acceptance simply stretch the bounds of credible argument. Thus, while Angelou may now flatly deny there was any evidence that she agreed to attend the award ceremony, we find there is significant evidence she did precisely that, substantially all of it coming from Angelou's agents and Angelou herself.

Additionally, Angelou's letter did not vary the terms of AOU's offer (e.g., that she would only, say, accept the award in Dallas), nor was it in any way equivocal (e.g., she would only "consider" coming); thus, her acceptance was in strict compliance with the terms of AOU's offer.[5]

 *Meeting of the minds:* Angelou next contends that because she did not intend to obligate herself to attend the AOU award ceremony, there was no evidence of a meeting of the minds. Again, the evidence of record and our objective standard of review dictate otherwise. The term "meeting of the minds" refers to the parties' mutual understanding and assent to the expression of their agreement. *See Weynand v. Weynand,* 990 S.W.2d 843, 846 (Tex.App.—Dallas 1999, pet. denied). The parties must agree to the same thing, in the same sense, at the same time. *Id.*

Having already discussed AOU's offer and Angelou's formal letter of acceptance in response, there is little to add to the issue of whether there was a meeting of the minds. We note, however, that it is manifest from the communications between Angelou and Ajayi, that AOU's elaborate preparations would only begin after Angelou agreed, in a formal letter of acceptance, to attend the award ceremony on a specific day and location. After being made aware that the requested formal letter of acceptance would trigger AOU's extensive preparations for an award ceremony in her honor, it is difficult to imagine that Angelou could have authorized such a letter without understanding and expecting it to communicate to AOU (1) her unequivocal assent to appear in accord with AOU's offer, and (2) her willingness to be bound by her acceptance of the offer. Thus, despite Angelou's avowed lack of subjective intent[6] to bind herself to ap-

5. We note that AOU proposed other events such as a book signing and television interview, however, it clearly stated that they were only tentative and that Angelou could forego these. In turn, Angelou does not contend these events were necessary to AOU's offer.

6. As Judge Learned Hand long ago observed in applying the objective theory of contract interpretation:

A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which

pear, we find her actions provided sufficient evidence of a meeting of the minds. *See Copeland,* 3 S.W.3d at 604.

*Communication that each party consented to the terms of the contract; execution and delivery of the contract with the intent it become mutual and binding on both parties:* As outlined above, these two elements were shown by the discussions between Angelou and AOU and with the delivery to AOU of Angelou's formal acceptance letter.

■■■■ *Consideration:* Angelou contends there was no consideration given by AOU to support the existence of a contract. Consideration consists of either a benefit to the promisor or a detriment to the promisee. *See Roark,* 813 S.W.2d at 496. It is a present exchange bargained for in return for a promise. *Id.* It may consist of some right, interest, or profit, or benefit that accrues to one party, or, alternatively, of some forbearance, loss or responsibility that is undertaken or incurred by the other party. *See Solomon v. Greenblatt,* 812 S.W.2d 7, 15 (Tex.App.—Dallas 1991, no writ). It is not necessary for a contract to be supported by a pecuniary consideration. *See City of Crystal City v. Crystal City Country Club,* 486 S.W.2d 887, 888 (Tex.Civ.App.-Beaumont 1972, writ ref'd n.r.e.); *see also Jennings v. Radio Station KSCS, 96.3 FM, Inc.,* 708 S.W.2d 60, 61 (Tex.App.-Fort Worth 1986) *rev'd on other grounds,* 750 S.W.2d 760 (Tex.1988) (plaintiff/listener entitled to collect contest proceeds; consideration to ra-

dio station was gain in new listeners who hoped to win contest).

The record yields considerable evidence that Angelou's promise to appear at the award ceremony induced AOU, to its detriment, to make elaborate preparations for the event. Likewise, there is evidence that AOU's detriments and obligations to Angelou induced her promise to appear. More specifically, AOU obligated itself[7] to bestow upon Angelou an "esteemed and prestigious" award. The award was previously given to another noted author, Prof. Chinua Achebe, and renowned artist, Dr. John Biggers. In her deposition, Angelou expressed her great admiration for both of these previous recipients. Additionally, AOU promised Angelou specially made ceremonial clothing and an elaborately carved staff. Finally, it promised to undertake to present the honor in an elaborate ceremony. The record does not show that AOU required any more in exchange from Angelou other than her willingness to accept the award at the ceremony. The evidence thus supports the conclusion that there was a mutual exchange of promises between Angelou and AOU, a benefit to Angelou, and a detriment to AOU. Therefore, their agreement was supported by consideration.

Finally, Angelou has defended the cancellation of her AOU appearance because of an "unforseen conflict," namely that the engagement conflicted with her contract with Living Bank.[8] We note that Angelou essentially stated at the outset of her discussions with AOU that she was willing to

---

ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort. Of course, if it appear by other words, or acts, of the parties, that they attribute a peculiar meaning to such words as they use in the contract, that meaning will prevail, but only by virtue of the other words, and not because of their unexpressed intent.

*Hotchkiss v. Nat'l City Bank,* 200 F. 287, 293 (S.D.N.Y.1911) (Hand, J.), *aff'd,* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913).

**7.** Angelou has not contended that AOU was not likewise bound to her to bestow the award in a manner commensurate with its offer to do so.

**8.** We have been provided no evidence that Angelou would have been in breach of any express provisions of her contract with Living Bank had AOU sold tickets for the award ceremony or had Angelou given a speech.

come to Houston to accept the award because it *coincided* with her Living Bank appearance. It appears, though, that Angelou may be relying upon an implicit contention that there was no contract with AOU because she discovered in September, 1998 that AOU, unbeknownst to her, was selling tickets to the award ceremony and that Angelou would be speaking there. However, this contention does not undermine the existence of the earlier-formed agreement of July 21, 1998. First, Angelou has not raised any issue in this interlocutory appeal which might establish an impediment to formation of an enforceable contract. Moreover, we observe that *after* learning of AOU's efforts to sell tickets and promote her giving a speech, Angelou, via her own booking agent, wrote the president of Living Bank a letter that, although Angelou would "not present a talk" at the AOU award ceremony, she would "say a few words to the gathering" about the Living Bank. This letter is significant because it provides evidence that, in spite of Angelou's and the Living Bank's awareness of AOU's unartistic acts (1) Living Bank no longer objected to her AOU appearance, and (2) Angelou nonetheless confirmed her agreement to appear at the AOU event.

For purposes of the jurisdictional argument, we find there is ample evidence in the record of that Angelou entered into an enforceable agreement with AOU, thus she has failed to meet her burden to negate the existence of a contract.

**Fair Play and Substantial Justice**

 We next determine whether the exercise of jurisdiction over Angelou would offend the notion of fair play and substantial justice. To defeat the fair play and substantial justice prong of due process, a nonresident defendant must present a compelling case that the exercise of jurisdiction would be unreasonable. *See In re S.A.V.*, 837 S.W.2d 80, 85 (Tex.1992). Only in rare instances will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state. *See Guardian Royal Exch.*, 815 S.W.2d at 231. This is true because the minimum contacts analysis encompasses so many considerations of fairness. *See Schlobohm*, 784 S.W.2d at 357–58. Nor is distance alone ordinarily sufficient to defeat jurisdiction; modern transportation and communication have made it much less burdensome for a party sued to defend himself in a state where it engages in economic activity. *See Guardian Royal Exch.*, 815 S.W.2d at 231.

 In determining whether the exercise of jurisdiction comports with the traditional notions of fair play and substantial justice, the court considers (1) the burden on the defendant; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *See Guardian Royal*, 815 S.W.2d at 228.

Angelou claims she did not purposefully direct any activities toward Texas, thus the "minimum contacts" prong is not established. Angelou does acknowledge her office sent the acceptance letter but claims the letter was merely "random, fortuitous, and attenuated" contact with the state. We disagree.

Angelou correctly points out that AOU initiated contact with her and that it made all subsequent phone calls to her. Still, this ignores other relevant facts of Angelou's involvement in the formation of her agreement to appear in Texas:

— Angelou determined the date of the event.

— She actively participated in and often controlled discussions about the event.

— She instructed Ajayi a number of times to send her information about the event to which she or her office would respond.

— She instructed her office to send information to be included in the program and for the event to be publicized.

In this light, her letter agreeing to be in Houston to accept the award on a specific date is far from "random, fortuitous, and attenuated" contact. Rather, it was the culmination of an extended process, in which Angelou, directly and through her agents, took an active role that led up to her agreement to come to Houston to accept the award.

Indeed, Angelou does not contend that trying the case in Texas would be unduly burdensome on her. She admitted in her deposition that she comes to Texas, specifically Austin, "quite a lot." Her appearances include at least twelve paid speaking engagements in Texas between 1995 and 1999. This includes four paid engagements in 1999. Additionally, Angelou has twenty-two books in print, all of which are sold in Texas. She stated that the southern states are a large source of sales for her books. Texas has some interest in resolving a dispute where the contract was to have been performed in Texas. AOU, as plaintiff, operating from the state of Texas, has chosen Texas as the forum obtaining the most convenient and effective relief.

The trial court's finding of specific jurisdiction over Angelou does not offend traditional notions of fair play and substantial justice. We therefore find that the trial court did not err in denying Angelou's special appearance based on specific jurisdiction. We overrule Angelou's specific jurisdiction issue. Because of this, we need not determine whether Texas courts may exercise general jurisdiction over her. *See* Tex.R.App. P. 47.1.

**Sanctions for Frivolous Appeal**

Finally, AOU has requested that we impose sanctions upon Angelou for a frivolous appeal of the trial court's order overruling her special appearance. *See* Tex.R.App. P. 45. The question of whether to grant sanctions is a matter of discretion, which we exercise with prudence and caution, and only after careful deliberation. *See Casteel–Diebolt v. Diebolt,* 912 S.W.2d 302, 306 (Tex.App.-Houston [14th Dist.] 1995, no writ). Although imposing sanctions is within our discretion, we will do so only in circumstances that are truly egregious. *See Bridges v. Robinson,* 20 S.W.3d 104, 114 (Tex.App.-Houston [14th Dist.] 2000, no pet. h.); *City of Houston v. Crabb,* 905 S.W.2d 669, 676 (Tex.App.-Houston [14th Dist.] 1995, no writ). Though we disagree with the merits of Angelou's appeal, after considering the record and Angelou's briefs, we do not believe the circumstances in this case warrant sanctions. We therefore overrule AOU's request for Rule 45 sanctions.

We affirm the trial court's order.