John S. MOORE, Appellant,

v.

PULMOSAN SAFETY EQUIPMENT CORPORATION, Appellee.

No. 14–07–00885–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 9, 2008.

Vincent L. Marable, III, Wharton, for appellant.

Michael A. Hatchell, Susan Allison Kidwell, Kim M. Olson, Austin, for appellee.

Panel consists of Chief Justice HEDGES and Justices GUZMAN and BROWN.

## OPINION

ADELE HEDGES, Chief Justice.

This appeal addresses the trial court's jurisdictional ruling on a special appearance filed by appellee, Pulmosan Safety Equipment Corporation ("Pulmosan"), in multi-district silica litigation. Appellant, John S. Moore ("Moore"), appeals the trial court's order granting Pulmosan's special appearance. The trial court found that it could exercise neither general nor specific jurisdiction over Pulmosan. Abandoning his general jurisdiction complaint, Moore argues that Pulmosan waived its special appearance and that the exercise of specific jurisdiction is proper. We affirm the trial court's ruling.

### I. BACKGROUND

Moore is an Alabama resident who worked as a sandblaster all over the United States. From 1968 to 1970, he worked as a sandblaster at the Uniroyal plant in Baton Rouge, Louisiana while employed by a Texas company. Moore alleges that he contracted silicosis and massive fibrosis from his sandblasting duties in Louisiana.

Pulmosan was a New York corporation operating from 1926 until its voluntary dissolution under the New York dissolution statute in 1986. It manufactured personal protective equipment for use in the abrasive-blasting industry. Moore alleges that he used the Pulmosan H–30 series sandblast hood from 1968 to 1970 while working in Baton Rouge. The H–30 hood protected the user's face, head, and shoulders from the ricochet of sandblasting. It was a non-airfed canvas hood, tannish brown in color, that draped over the user's head and shoulders. The number of H–30 hoods

manufactured per year during the relevant time frame of the 1960's through 1975 is disputed. There is both evidence that production was in the "tens of thousands" and evidence that it was only one to two thousand per year. It is undisputed, however, that the hoods were manufactured by Pulmosan in New York.

### The method of sale and distribution of the H–30 hood in Texas.

Pulmosan did not sell directly to end-users such as Moore, or even to his employers. Instead, Pulmosan sold its products through distributors and what it called "original equipment manufacturers" ("OEMs"). Pulmosan described the distributors as "simply Pulmosan's wholesale customers—the 'accounts [Pulmosan was] selling to.'" OEMs were companies that ultimately sold the equipment to employers and end-users, either under the Pulmosan label or under a private label. Pulmosan's corporate representative, Howard Weiss, characterized the distributors and OEMs as independent third-parties who were not controlled or employed by Pulmosan.

Pulmosan had several Texas distributors and OEMs selling its equipment in Texas during the time period Moore claimed to have used the H–30 hoods.[1] One of the OEMs was a Houston-based company called Clemtex. Clemtex began selling H–30 hoods in Texas in 1955 and continued selling them until 1982. A Clemtex representative testified that Clemtex purchased hoods and 99.9 percent of them were purchased directly from Pulmosan. Initially, the Pulmosan hoods Clemtex sold had a Pulmosan label, but eventually Clemtex furnished Pulmosan with Clemtex labels to be affixed to the hoods. Weiss referred to this practice as "private-labeling." There is evidence that Clemtex sold safety equipment to Moore's employer during the relevant time period and that the employer provided a Pulmosan H–30 hood to Moore.

Beginning in the late 1960's or early 1970's, Pulmosan placed an employee in the Dallas–Fort Worth area. The employee's job was to call on distributors and sell Pulmosan's products. The employee's territory encompassed three or four states, including Texas, Oklahoma, Louisiana, and possibly Arkansas. This employee later became a "manufacturer's representative," rather than a direct employee of Pulmosan, and Pulmosan continued to have a manufacturer's representative in Texas for the last fifteen or twenty years of its existence. The manufacturer's representatives sold Pulmosan's products on commission. During this time, Pulmosan had a Certificate of Authority on file with the State of Texas for the purpose of transacting business in the state.

Pulmosan also advertised its products throughout the United States in catalogs. Pulmosan normally sent the catalogs to anyone who was purchasing from them, "whether distributors, dealers, or OEM accounts." The 1964 catalog identified five warehouses across the United States for Pulmosan products, including one in Houston, Texas. The warehouse was owned and operated by a Pulmosan manufacturer's representative. Instructions for product use were included in the product boxes and in the catalogs that Pulmosan sent to whoever bought equipment from Pulmosan. Pulmosan relied on the employers to make sure that the employee was properly instructed and the equipment properly maintained.

---

1. When asked whether he knew the type of plants, factories, or contractors who would be the end users for the products, Weiss said that almost every type of industry was using them, but he did not know exactly to whom the distributors sold Pulmosan products.

*Moore's lawsuit and Pulmosan's jurisdictional challenges.*

Moore brought suit against numerous manufacturers and suppliers of sand and abrasive blasting equipment and protective gear, asserting claims for negligence, products liability (defective manufacture and design), conspiracy, and fraud. Moore's suit was transferred to the silica multi-district litigation pending in Judge Tracy Christopher's court.

Pulmosan filed a special appearance and a plea to the jurisdiction. Before it heard Pulmosan's special appearance, the trial court abated the proceedings so that certain plaintiffs in the litigation could proceed in New York state court to obtain a ruling on the viability of their claims in light of Pulmosan's dissolution. The New York court ruled that the dissolution of Pulmosan was not effective as to those plaintiffs whose causes of action arose prior to the date of dissolution, specifying its effectiveness would "depend upon when these plaintiffs were first exposed to silica dust or, more accurately, upon the initial use of Pulmosan's defective safety equipment."

■ Thereafter, the trial court in Texas granted Pulmosan's special appearance with regard to general jurisdiction. Under *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, a trial court must assess contacts over a reasonable number of years, up to the date of filing the lawsuit. 235 S.W.3d 163, 169 (Tex.2007). Pulmosan had not done business, in Texas or elsewhere, since its dissolution in 1986. The court thus held that general jurisdiction did not exist. Moore has not appealed the trial court's ruling on general jurisdiction.

The trial court also granted Pulmosan's special appearance for want of personal jurisdiction on the basis of specific jurisdiction. The court held that it could not exercise specific jurisdiction over Pulmo-

san consistent with the requirement of the claims arising out of or relating to the defendant's activity conducted within Texas. *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007). The trial court relied on the following: (1) Moore used the Pulmosan product in Louisiana, not Texas; (2) there were no pleadings or allegations of a tort's occurrence in Texas; (3) there were no allegations of representations or warranties made in Texas; (4) Pulmosan's hood was not manufactured in Texas; and (5) the mere fact that Pulmosan's hood passed through Texas is not sufficient to support specific jurisdiction. Moore appeals the trial court's ruling that specific jurisdiction did not exist and that Pulmosan did not waive its special appearance. The trial court issued extensive findings of fact and conclusions of law.

## II. WAIVER OF SPECIAL APPEARANCE?

■ In his first issue Moore contends that the trial court erred in failing to find Pulmosan waived its special appearance. A defendant waives its right to contest, under Texas Rule of Civil Procedure 120a, the trial court's exercise of personal jurisdiction over it when the defendant: (1) invokes the judgment of the court on any question other than jurisdiction; (2) engages in acts that recognize an action is properly pending; or (3) seeks affirmative action from the court. *See Dawson–Austin v. Austin,* 968 S.W.2d 319, 322 (Tex. 1998); *Angelou v. African Overseas Union,* 33 S.W.3d 269, 275 (Tex.App.-Houston [14th Dist.] 2000, no pet.). We review a trial court's finding with regard to waiver under a de novo standard of review. *See, e.g., Exito Elecs. Co. v. Trejo,* 142 S.W.3d 302, 304–05 (Tex.2004) (per curiam).

In its original special appearance pleading, Pulmosan asserted two grounds it

claimed warranted dismissal: (1) the trial court lacked jurisdiction over it because after Pulmosan's dissolution under the laws of the State of New York in 1986, there was no longer an entity that could be sued; and (2) asserting jurisdiction over it would offend traditional notions of fair play and substantial justice and would be inconsistent with the due process clauses of the United States and Texas constitutions. The original special appearance pleading included neither the words "personal jurisdiction" nor an express argument that Pulmosan lacked sufficient minimum contacts with the State of Texas to support either general or specific jurisdiction. Pulmosan later amended its special appearance to assert these arguments. Moore contends that Pulmosan's failure to expressly assert lack of minimum contacts in its original special appearance pleading, together with counsel's statements in open court that Pulmosan was not making a "not doing business in Texas" argument, resulted in a waiver of Pulmosan's special appearance.

The trial court found that Pulmosan did not waive its special appearance, relying on *Dawson–Austin*, because the special appearance could properly be amended. Further, counsel's statement in open court was not construed as an admission because it was not a direct, clear and unequivocal waiver of the claim of lack of jurisdiction but rather a statement that Pulmosan was moving forward first on its dissolution argument.

Rule 120a permits amendments to cure "defects" but does not specify the type of defect. Rule 120a(1) provides in pertinent part:

... Such special appearance shall be made by sworn motion filed prior to motion to transfer venue or any other plea, pleading or motion; provided however, that a motion to transfer venue and any other plea, pleading, or motion may be contained in the same instrument or filed subsequent thereto without waiver of such special appearance; and may be amended to cure defects.

Tex.R. Civ. P. 120a(1).

■ In *Dawson–Austin*, the Texas Supreme Court held that Rule 120a allowed a nonresident to amend a special appearance to cure the defect of failing to attach a verification. 968 S.W.2d at 322. In *Trejo*, the Court held that an allegedly defective affidavit submitted in support of a special appearance went to the merits of the jurisdictional question and was not a waiver issue. 142 S.W.3d at 308 ("Any defect in proof goes to the merits, it is simply not a waiver issue."). Generally, courts do not find waiver of a special appearance where a party does not acknowledge the jurisdiction of the trial court or take any actions inconsistent with challenging personal jurisdiction. *See, e.g., id.* at 306–07 (seeking a ruling on jurisdictional discovery dispute was not a waiver); *Angelou*, 33 S.W.3d at 276 (filing Rule 11 agreement with court prior to assertion of special appearance was not a waiver).

Pulmosan argues that its pleading gave Moore "fair notice" of its intent to challenge personal jurisdiction and, under Texas Rule of Civil Procedure 120a and *Dawson–Austin*, Pulmosan was free to amend its special appearance. We agree.[2] Pul-

---

**2.** Pulmosan further argues that even if its pleading was defective, once it challenged personal jurisdiction, Moore was required to specially except and provide Pulmosan with an opportunity to clarify its pleading or cure any defects. Pulmosan relies upon *Low v.*

*Henry*, 221 S.W.3d 609 (Tex.2007); *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607 (Tex.2004); and *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887 (Tex.2000). We acknowledge that Texas is a "fair notice" pleading state and that a party must specially except and

mosan stated in its special appearance that an assertion of jurisdiction over it would offend traditional notions of fair play and substantial justice and would violate due process. The pleading did not contain the words "personal jurisdiction," but neither does Rule 120a. *See* Tex.R. Civ. P. 120a(1) (providing party may file special appearance for purpose of objecting to court's jurisdiction over the defendant's person or property). More importantly, the pleading does not acknowledge the jurisdiction of the trial court and does not make any claims or actions inconsistent with a challenge to the trial court's jurisdiction over Pulmosan. *See Trejo,* 142 S.W.3d at 306; *Angelou,* 33 S.W.3d at 276.

■ When Pulmosan amended its special appearance pleading, it did not assert a wholly new ground for lack of personal jurisdiction in its amended pleadings. It expanded on and gave more detail of the ground already included. Failure to specify details of its personal jurisdiction argument could have perhaps justified the trial court's denying the motion to dismiss for want of jurisdiction, but it should not result in a waiver. *See Trejo,* 142 S.W.3d at 307–08 (holding that defect in proof means trial court could properly deny special appearance, but it is not a waiver issue); *see also Dawson–Austin,* 968 S.W.2d at 322 (Rule 120a permits amendments to cure defects and does not limit kinds of defects that can be cured).

■ Moore continues his waiver challenge by pointing to statements made by Pulmosan's counsel at a discovery hearing that Pulmosan was not making a "not doing business in Texas" type of argument. We agree with the trial court that these statements did not waive the special appearance. Assuming without deciding that the statements were a judicial admission of minimum contacts, it simply disposed of one aspect of the jurisdictional analysis. It did not address the substantial connection or fair-play elements of the jurisdictional inquiry and thus did not waive the entire ground that the trial court lacked jurisdiction.

■ Finally, Moore asserts that the "one issue" that can be raised in a special appearance is whether a party is subject to minimum contacts. This argument is supported by neither the express language of Rule 120a nor the cases cited by Moore. *See Glattly v. CMS Viron Corp.,* 177 S.W.3d 438, 446 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (discussing rule that court should not address merits-question in special appearance); *I & JC Corp. v. Helen of Troy,* 164 S.W.3d 877, 890 (Tex. App.-El Paso 2005, pet. denied) (same). Moore also cites several cases for the proposition that an argument that a trial court lacks subject-matter jurisdiction cannot be made in a special appearance. Pulmosan did not assert lack of subject matter jurisdiction in its special appearance pleading; rather, it argued lack of personal jurisdiction based on traditional notions of fair play, substantial justice, and due process. We overrule Moore's first issue.

### III. PERSONAL JURISDICTION

### A. *Standards of Review.*

■ Whether a trial court has personal jurisdiction over a defendant is a question of law reviewed de novo by this court. *Moki Mac,* 221 S.W.3d at 574; *Kel-*

give the other party a chance to cure. But the cases Pulmosan relies upon are not special appearance cases. *See Low,* 221 S.W.3d at 612 (addressing motion for sanctions); *Garza,* 164 S.W.3d at 616–17 (addressing plaintiff's petition in employment case); *Auld,* 34 S.W.3d at 897 (addressing defendant's answer for fair notice of intent to rely on statutory damages cap).

ly v. General Interior Constr., Inc., 262 S.W.3d 79, 83 (Tex.App.-Houston [14th Dist.] 2008, pet. filed). The trial court, however, must often resolve questions of fact before deciding the jurisdictional question. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.2002). In considering the denial of a motion to dismiss for want of jurisdiction asserted during a special appearance, the court determines only the issue of jurisdiction, not liability. *Kelly*, 262 S.W.3d at 83. If a trial court issues findings of fact and conclusions of law, the appellant may challenge the fact findings on legal and factual sufficiency grounds. *Id.*

 The plaintiff bears the initial burden of pleading sufficient allegations to invoke the jurisdiction of the Texas long-arm statute. *Am. Type Culture Collection v. Coleman*, 83 S.W.3d 801, 807 (Tex.2002). The nonresident defendant then has the burden of negating all bases of jurisdiction asserted in the plaintiff's allegations. *BMC Software*, 83 S.W.3d at 793.

Texas courts may assert personal jurisdiction over a nonresident defendant if (1) the Texas long-arm statute authorizes the exercise of jurisdiction; and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees. *Moki Mac*, 221 S.W.3d at 574. The Texas long-arm statute provides in pertinent part that a non-resident does business in Texas if it "commits a tort in whole or in part in this state." Tex. Civ. Prac. & Rem.Code § 17.042(2). The Texas long-arm statute, however, reaches only "as far as the federal constitutional requirements of due process will allow." *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex.1991).

 Federal due-process limitations are satisfied if the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *Moki Mac*, 221 S.W.3d at 575. A nonresident establishes minimum contacts with Texas by purposefully availing itself of the privileges and benefits inherent in conducting business in the state. *Id.; Control Solutions, Inc. v. Gharda Chem. Ltd.*, 245 S.W.3d 550, 557 (Tex.App.-Houston [1st Dist.] 2007, no pet.). Sellers who create "continuing relationships and obligations with citizens of another state" are subject to jurisdiction based on their activities in the forum state. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex.2005). In assessing minimum contacts, the quality and nature of the contacts, rather than their number, are determinative. *Control Solutions*, 245 S.W.3d at 557. Random, fortuitous, or attenuated acts, or unilateral acts of third-parties, are not sufficient. *Michiana*, 168 S.W.3d at 785.

 A nonresident manufacturer of products need not have offices or employees in the forum state to meet the purposeful availment test. *Id.* Under the stream of commerce theory, a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state is subject to jurisdiction in suits arising from that activity. *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). A plurality of the U.S. Supreme Court and the Texas Supreme Court have held, however, that the mere sale of a product to a resident is not sufficient-the allegations must also indicate an intent to serve the forum market. *Asahi Metal Ind. Co. v. Superior Court*, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Moki Mac*, 221 S.W.3d at 577. Examples of "additional conduct" that may

evidence an intent to serve the forum market are: (1) designing the product for the market in the forum state; (2) advertising in the forum state; (3) establishing channels of regular communication with customers in the forum state; and (4) marketing the product through a distributor who has agreed to serve as the sales agent in the forum state. *Asahi Metal*, 480 U.S. at 112, 107 S.Ct. 1026.

In the context of specific jurisdiction, intent to serve the Texas market is still not alone sufficient to confer jurisdiction over a nonresident defendant. To assert specific jurisdiction over a nonresident defendant, the allegations must also indicate that the defendant's liability arises from or relates to the defendant's minimum contacts with the forum state. *Moki Mac*, 221 S.W.3d at 576. A defendant's liability arises from or relates to its minimum contacts when there is a substantial connection between the defendant's contacts and the operative facts of the litigation. *Id.* at 585.

### B. *Pulmosan's Minimum Contacts with Texas.*

In his second issue, Moore contends the trial court erred in finding that it could not exercise specific jurisdiction over Pulmosan. In determining whether, under the stream of commerce theory, the trial court properly found it could exercise specific jurisdiction over Pulmosan, we must examine the record for evidence that: (1) Pulmosan purposefully directed acts towards Texas indicating that it intended to serve the Texas market; and (2) Pulmosan's liability arises from or relates to its contacts with Texas. *See Moki Mac*, 221 S.W.3d at 577, 585.

Our inquiry into Pulmosan's purposeful direct acts toward Texas begins with an examination of *Moki Mac*, the supreme court's recent seminal pronouncement on specific jurisdiction. In *Moki Mac*, the plaintiffs' minor son died while on a river-rafting trip in Arizona with Moki Mac River Expeditions, a Utah-based company. *Id.* at 573. The Texas Supreme Court examined two sets of facts in determining whether the Utah company had purposefully availed itself of the forum state. First, the court reviewed Moki Mac's marketing efforts in Texas and found that Moki Mac knowingly sold rafting trips to Texas residents and purposefully directed marketing efforts to Texas with the intent to solicit business from this state. *Id.* at 577–78. Moki Mac solicited Texas residents through mass and targeted direct-marketing email campaigns, sending brochures and trip information to people who had previously expressed interest in a trip, offering "free floats" to customers who coordinated a group of ten or more (at least two Texas residents earned the "free float") and paid a fee to a travel agency located in Houston, resulting in multiple trips involving Texas residents. *Id.* at 578.

Second, the defendant in *Moki Mac* established "channels of regular communication with its customers in Texas." *Moki Mac*, 221 S.W.3d at 578. The defendant set up particular customers as *de facto* group leaders to plan, organize, and promote its trips and had a Texas resident as such a group leader. *Id.* In fact, the trip the plaintiffs' son attended was planned by one such group leader—the plaintiffs were not directly solicited by Moki Mac. *Id.* Moki Mac kept the communication channels open by automatically sending information regarding new trips, schedules, and prices to those on its mailing list who had been customers or who had expressed an interest in a trip within a three year period. *Id.* The Court found that Moki Mac's advertisements directed toward Texas and its use of channels of regular communication with its customers showed an intent

by Moki Mac to serve the Texas market, thus satisfying the purposeful availment prong. *Id.*

### 1. *Evidence of Pulmosan's direct acts toward Texas.*

 Like the defendant in *Moki Mac,* Pulmosan set up channels of regular communication with Texas customers. It had distributors and OEMs in Texas that sold its products to Texas residents. During the relevant time period, Pulmosan had an employee in Texas whose duties included calling on the Texas distributors to sell Pulmosan's products. Pulmosan later had manufacturer's representatives whose territory included Texas and who also called on Texas distributors. The representatives were paid commissions from Pulmosan for the sale of its products. Placing a sales representative in the state to call on Texas distributors to sell Pulmosan's products shows an intent to serve the Texas market.[3] Moreover, the manufacturer's representatives are similar to the *de facto* group leaders the nonresident defendant used in *Moki Mac* and which evidenced an intent to serve the Texas market. *Moki Mac,* 221 S.W.3d at 578.

Also like the defendant in *Moki Mac,* Pulmosan regularly sent its catalogs to "anyone who was buying from it," including the Texas distributors and OEMs. One of the Pulmosan OEMs was Clemtex, a Texas based company who sold hoods to Moore's employer. In fact, Weiss testified that Pulmosan sold products to Clemtex "for a good many years." In its 1964 catalog, Pulmosan advertised several warehouses across the United States for its products, including one in Houston, Texas.

Pulmosan had a certificate of authority to do business in Texas. This evidence is sufficient to show that, during the time Moore claimed to have used Pulmosan hoods, Pulmosan purposely directed its products toward Texas showing an intent to serve the Texas market. *See id.* at 578; *Control Solutions,* 245 S.W.3d at 561.

Pulmosan argues that the evidence does not show purposeful availment because the distributors and OEMs were independent third parties, and *Michiana* tells us that shipping products in response to actions by third parties is not sufficient. *See Michiana,* 168 S.W.3d at 785. Pulmosan's reliance on *Michiana* is misplaced. In that case, an R.V. manufacturer sent one product into Texas at the unilateral request of a Texas resident. *Id.* at 787. Unlike *Michiana,* Pulmosan was not passively sitting in its shop in New York when one Texas resident called on the phone to purchase a product. Pulmosan sent products into Texas for "a good many years" and utilized a sales employee and manufacturer's representatives to call on and solicit sales from Texas residents. The fact that the distributors and OEMs were independent of Pulmosan does not shield it from jurisdiction. *See Moki Mac,* 221 S.W.3d at 578 (use of *de facto* group leaders, who were not agents or employees of the company, to plan, organize and promote trips to Texas residents was evidence of purposeful availment); *Control Solutions,* 245 S.W.3d at 560–61 (use of independent Texas company to distribute products was evidence of intent to serve Texas market).

Pulmosan also contends that the warehouse in Houston cannot support jurisdiction because it was owned and operated by

---

**3.** Pulmosan argues that specific jurisdiction cannot rest solely on the shoulders of this one sales representative. There is evidence, however, of other acts by Pulmosan which showed an intent to serve the Texas market.

*See infra.* In addition, courts must look to the quality and nature of the contacts rather than their number. *See Control Solutions,* 245 S.W.3d at 557.

an independent manufacturer's representative. This argument, however, ignores the fact that Pulmosan chose to advertise the warehouse in its catalog; it was not the unilateral act of a third party. Pulmosan advertised the availability of its products in Texas, thus showing an intent to serve the Texas market.

In sum, the evidence shows that Pulmosan set up a chain of distribution of its products aimed at Texas, through the use of Texas distributors and OEMs, as well as a sales employee and manufacturer's representatives. This evidence satisfies the purposeful availment prong of the jurisdictional test.

2. *Evidence of a substantial connection between Pulmosan's contacts and the operative facts of the litigation.*

In *Moki Mac*, the Texas Supreme Court analyzed in depth the due process requirement that a nonresident defendant's contacts with the forum must "arise out of or relate to" the litigation in order to support specific jurisdiction. *Moki Mac*, 221 S.W.3d at 579–85. After reviewing various approaches applied by other jurisdictions, the Court determined that, under Texas law, there must be a substantial connection between the nonresident's contacts and the operative facts of the litigation. *Id.* at 585. To identify the operative facts of the litigation, the Court selected those facts that would be the focus of the trial. *Id.*

Here, the trial court found that no substantial connection existed because Moore worked in and used Pulmosan's product in Louisiana. Moore claims that the use of the product in another state is not a *per se* prohibition against a substantial connection, citing evidence that the Pulmosan hood was purchased by his Texas employer and passed through Texas on its way to Louisiana. We agree with the trial court that there is no substantial connection between Pulmosan's contacts with Texas and the operative facts of the litigation.

The operative facts of Moore's claim against Pulmosan involve products manufactured in New York and used in Louisiana. The alleged exposure and injury thus occurred in Louisiana. The relevant facts will be the state of the product as it left New York and the conditions in which Moore used the product and worked in Louisiana. The fact that the product passed through Texas is not an operative fact. Under *Moki Mac*, there is no substantial connection. *See Moki Mac*, 221 S.W.3d at 588 (relationship between death on hiking trail in Arizona and defendant's Texas promotional activities was too attenuated to satisfy specific jurisdiction's due process concerns).

Moore cites *Flanagan v. Royal Body Care, Inc.* to support his claim that a substantial connection can exist even if the alleged injury did not occur in Texas. 232 S.W.3d 369 (Tex.App.-Dallas 2007, pet. denied). It is true that the plaintiff's alleged use of and injury from the product in *Flanagan* did not occur in Texas. In that case, the claim at issue in the special appearance was not the plaintiffs' claim against the nonresident defendant; rather, the claim was one for contribution between the Texas seller of the product and the nonresident manufacturer. *Id.* at 377. The Dallas Court of Appeals found a substantial connection between the contacts and the operative facts of the contribution claim because the nonresident defendant had marketed the product in Texas, sent the product to Texas, and personally met with the seller in Texas. *Id.* The contribution claim involved those Texas contacts and thus satisfied the *Moki Mac* standard. *Flanagan* does not support Moore's argument in this case.

Moore also cites *EMI Music Mexico, S.A. de C.V. v. Rodriguez* in support of his

claim that the location of his use of and injury from the product is not dispositive. 97 S.W.3d 847 (Tex.App.-Corpus Christi 2003, no pet.). That case, however, was decided before *Moki Mac.* Moreover, the operative facts are entirely different from those of this case. The plaintiff in *EMI Music* asserted a negligent entrustment of a vehicle claim. *Id.* at 856. While the accident occurred in Mexico, the negligent entrustment of the vehicle occurred in Texas where the trip started. *Id.* Thus, a substantial connection existed. *EMI Music* is not on point. We overrule Moore's second issue.

## IV. CONCLUSION

We conclude that Pulmosan did not waive its special appearance and that the trial court properly determined that a substantial connection did not exist between Pulmosan's contacts with Texas and Moore's claims. We therefore affirm the trial court's order granting Pulmosan's special appearance.