**Reversed, Rendered, and Remanded and Majority and Dissenting Opinions filed July 25, 2019.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-17-00976-CV

---

### KYLE TAUCH, Appellant

### V.

### VIRGINIA ANGEL, TRUSTEE FOR THE GOBSMACK GIFT TRUST, AS ASSIGNEE OF SOUTH STATE BANK, AND SOUTH STATE BANK, Appellees

---

**On Appeal from the 127th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2016-33404**

---

## M A J O R I T Y   O P I N I O N

The dispositive issue presented in this appeal is whether appellant Kyle Tauch entered into a valid and enforceable settlement agreement with appellee South State Bank. Tauch appeals a summary judgment against him declaring that he and the bank do not have a settlement agreement. The trial court concluded that the bank impliedly revoked its settlement offer before Tauch attempted to accept it.

We conclude as a matter of law that the bank made a settlement offer to Tauch, the bank did not impliedly revoke its offer before Tauch accepted, and consequently Tauch and the bank have a valid settlement agreement. Accordingly, we reverse the trial court's judgment and remand the case to the trial court for further proceedings.

## Background

A district court in South Carolina rendered a $4.6 million judgment in First Federal Bank's favor against Tauch. South State Bank is First Federal Bank's successor in interest. South State Bank domesticated the judgment in Texas.

On April 11, 2016, following prior negotiations to settle the outstanding judgment, South State Bank's senior vice president, James Holden, emailed Tauch, stating that Holden "received authority to release your judgment for net proceeds of $2,000,000 which is still over a 50% discount. If you find that you and your investors can make this happen, please let me know as quickly as possible as the bank will likely be look[ing] at other collection alternatives." Tauch did not immediately respond.

Two days later, an attorney representing a third party, Virginia Angel, emailed Tauch's attorney and informed him that South State Bank had assigned its interest in the South Carolina judgment to Angel. Angel demanded immediate payment for the full amount of the judgment. At Tauch's request, Angel's attorney sent a copy of the assignment agreement ("Assignment Agreement") to Tauch's attorney by email at 5:23 p.m. on April 13. The Assignment Agreement's effective date was the next day, April 14, 2016. Shortly after receiving a copy of the Assignment Agreement, Tauch emailed Holden on April 13 at 6:12 p.m. and stated: "I have spoken with my investors and they are OK with your offer. We agree to the 2 million payment which is a release and not a purchase." South State

2

Bank's attorney responded to Tauch by email, stating that the bank assigned the judgment before receiving Tauch's acceptance email to Holden, that the bank would not be forwarding any settlement paperwork, and that Tauch should make all payments on the judgment directly to the assignee, Angel.

In May, Angel and South State Bank signed a "Clarification of Assignment." ("Clarification Agreement"). The Clarification Agreement states that the Assignment Agreement's April 14 effective date was a mistake and that the Assignment Agreement "was meant to be dated and effective on April 13, 2016."

Angel then filed suit, seeking a declaratory judgment that, as a matter of law: (1) Tauch could not have accepted the bank's settlement offer on April 13 because Tauch's receipt of the Assignment Agreement, before he attempted to accept, terminated his power of acceptance; (2) Tauch's April 13 email accepting the bank's offer did not form a contract because essential terms are missing from the relevant emails; and (3) Tauch owes the full amount of the South Carolina judgment, plus interest, to Angel.

Tauch filed counterclaims against Angel, seeking a declaratory judgment that his April 13 email to Holden constituted an acceptance of South State Bank's offer and formed a binding $2 million settlement agreement. He also asserted a claim for tortious interference with contract. Tauch filed a third-party petition against South State Bank, asserting a claim for breach of the settlement agreement.

Angel and Tauch filed cross-motions for summary judgment on their competing declaratory judgment claims. Angel argued that South State Bank's execution of the Assignment Agreement, coupled with Tauch's receipt of the Assignment Agreement, impliedly revoked the bank's April 11 settlement offer, and that Tauch therefore had no power to accept the bank's offer on April 13 at 6:12 p.m. Tauch argued that his April 13 6:12 p.m. email constituted an

3

acceptance of Holden's offer and created a binding and enforceable settlement contract.

The trial court granted Angel's motion and implicitly denied Tauch's motion. The court concluded that Tauch could not have accepted the offer made by South State Bank to settle the South Carolina judgment because Tauch's power of acceptance terminated upon notice of, and Tauch's receipt of, the Assignment Agreement. Because the court held that Tauch has no binding contract with South State Bank to compromise and settle the South Carolina judgment, the court signed a final judgment that Tauch take nothing on his claims against Angel and South State Bank. The trial court awarded Angel and South State Bank their attorney's fees, in amounts agreed by all parties, but provided that Tauch could recover his fees from Angel and the bank if he prevailed on appeal.

## Analysis

Tauch presents four issues for our review, but all are based on a central argument: he entered into a valid and binding settlement agreement with South State Bank on April 13 at 6:12 p.m. before the Assignment Agreement became effective.

### A.    Standard of review

The parties' cross-motions for summary judgment present a question of law regarding the existence of a settlement agreement. We review the trial court's order granting or denying summary judgment on cross-motions de novo. *See Lane-Valente Indus. (Nat'l), Inc. v. J.P. Morgan Chase, N.A.*, 468 S.W.3d 200, 204 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *see also Wausau Underwriters Ins. Co. v. Wedel*, 557 S.W.3d 554, 557 (Tex. 2018) ("A declaratory judgment granted on a traditional motion for summary judgment is reviewed de novo.")

4

(internal quotation omitted). When both sides move for summary judgement and the trial court grants one motion and denies the other, we review both sides' summary judgment evidence to determine all questions presented. *Lane-Valente Indus.*, 468 S.W.3d at 204. A movant is entitled to summary judgment if it establishes that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Id.*

**B.    The parties' cross-motions for summary judgment**

Tauch moved for summary judgment on his declaratory judgment claim, arguing that Holden's April 11 email and Tauch's April 13 email together constitute a valid, binding, and enforceable settlement agreement. Settlement agreements are governed by principles of contract law. *See id.* Under Texas law, a legally enforceable contract generally consists of: (1) an offer; (2) acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; (5) execution and delivery of the contract with the intent that it be mutual and binding; and (6) consideration. *See Coleman v. Reich*, 417 S.W.3d 488, 491 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 72 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

Angel opposed Tauch's motion on three grounds: (1) Holden's email was not an offer; (2) Tauch's email was not an acceptance; and (3) the emails together lack essential terms necessary to settlement.

1. *Was South State Bank's April 11 email an offer?*

We first address whether Tauch proved as a matter of law that Holden's April 11 email was an offer. An offer "must be reasonably definite in its terms and must sufficiently cover the essentials of the proposed transaction that, with an

5

expression of assent, there will be a complete and definite agreement on all essential details." *Principal Life Ins. Co. v. Revalen Dev., LLC*, 358 S.W.3d 451, 455 (Tex. App.—Dallas 2012, pet. denied) (citing *Edmunds v. Houston Lighting & Power Co.*, 472 S.W.2d 797, 798-99 (Tex. App.—Houston [14th Dist.] 1971, writ ref'd n.r.e)); *see also Advantage Physical Therapy, Inc. v. Cruse*, 165 S.W.3d 21, 26 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (offer must be clear and definite just as there must be a clear and definite acceptance of all terms contained in the offer); Restatement (Second) of Contracts § 24 (an offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it).

Tauch and South State Bank engaged in a series of electronic mail communication in an attempt to settle the South Carolina judgment. In December 2015, Tauch sent Holden an email, "proposing a payment of $250,000 to settle" the judgment. Holden responded that "the bank is unable to accept your settlement offer of $250,000." Tauch then asked for "any direction on" what the bank would be willing to accept as a settlement. Holden responded that he could not "see the bank being able to entertain any settlement offers less than $1M given [Tauch's] judgment total. If [Tauch] [could] find some help to get [him] to that level," Holden indicated that he would be interested in further negotiations. In January 2016, Tauch again emailed Holden, proposing "payment of 1 million within 45 days of a settlement agreement which is in the form of a purchase of the judgment." Holden acknowledged receipt of that "email and offer" and stated that he would "put a package together today with the terms and submit it to [the bank's] senior management for final approval." After two months passed without approval from the bank, Tauch contacted Holden and said he was "willing to just settle the judgment for 1 million instead of purchasing the judgment."

In response, Holden sent the following email to Tauch on April 11:

I received word . . . that the bank will not be able to accept your offer to sell your note/judgment or take a discounted settlement for the outright release price of $1M that you had offered. . . . To assist you in understanding what amount the bank would be able to accept, I did ask for a counter figure and received authority to release your judgment for net proceeds of $2,000,000 which is still over a 50% discount. If you find that you and your investors can make this happen, please let me know as quickly as possible as the bank will likely be look[ing] at other collection alternatives.

The terms of Holden's April 11 email—to release the outstanding judgment in exchange for net proceeds of $2,000,000—are clear and definite. The email covers "the essentials of the proposed transaction" that, with an expression of Tauch's assent, "there will be a complete and definite agreement." *Principal Life Ins. Co.*, 358 S.W.3d at 455; *see also Advantage Physical Therapy*, 165 S.W.3d at 26.

In opposition, Angel contends that Holden's April 11 email was exploratory, and not a firm offer. Angel likens Holden's email to an invitation for an offer:

A writes B, "I am eager to sell my house. I would consider $20,000 for it." B promptly answers, "I will buy your house for $20,000 cash." There is no contract. A's letter is a request or suggestion that an offer be made to him. B has made an offer.

Restatement (Second) of Contracts § 26, illus. 4.

We disagree. Nothing in Holden's email indicates that the bank would merely consider releasing the judgment for $2 million if Tauch offered to do so. Rather, Holden's email makes clear that he had "authority to release [Tauch's] judgment" for a sum certain and that, upon Tauch's assent to Holden's $2 million offer, the parties would conclude their dealing. Holden was awaiting a response from Tauch whether he could "make this happen." Holden's April 11 email is both

7

a rejection of Tauch's $1 million offer and a clear counteroffer to release the judgment in exchange for $2 million. We hold that Holden's April email constitutes an offer as a matter of law.

2. *Was Tauch's April 13 email an acceptance?*

The next issue is whether Tauch proved as a matter of law that he accepted the bank's offer. An offeree must communicate a clear and definite acceptance of all terms contained in the offer. *See Advantage Physical Therapy*, 165 S.W.3d at 26; *see also* Restatement (Second) of Contracts § 50(1) (acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer). The offeree must accept in strict compliance with the material terms of the offer. An acceptance that is conditioned on terms at variance with those in the offer operates as a counteroffer and terminates the original offer. *See Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 512 (Tex. 2014).

In response to Holden's April 11 offer, Tauch sent Holden an email on April 13 at 6:12 p.m., stating:

> I have spoken with my investors and they are OK with your offer. We agree to the 2 million payment which is a release and not a purchase.
> Please send paperwork so I can review.

Tauch's response accepted the material terms of Holden's offer. He "agree[d] to" the bank's offer of a "2 million payment" to release the outstanding judgment. He did not vary the terms of Holden's offer, nor was his acceptance equivocal or conditional; thus, Tauch's email is a clear and definite acceptance of all material terms contained in Holden's offer. *See, e.g., Angelou v. African Overseas Union*, 33 S.W.3d 269, 279 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ("Angelou's letter did not vary the terms of AOU's offer (e.g., that she would

8

only, say, accept the award in Dallas), nor was it in any way equivocal (e.g., she would only 'consider' coming); thus, her acceptance was in strict compliance with the terms of AOU's offer.").

Angel contends, however, that by requesting paperwork for review Tauch contemplated additional terms as part of the settlement agreement. Again, we disagree. Tauch's acceptance was not conditioned on any particular detail, such as further documentation; the settlement was therefore binding upon his acceptance so long as the other contract elements are met. *See, e.g.*, *MKM Eng'rs, Inc v. Guzder*, 476 S.W.3d 770, 779 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("[T]he Rule 11 Agreement is not unenforceable merely because the parties contemplated taking additional actions and executing a final settlement agreement at a later date."); *see also Lerer v. Lerer*, No. 05-02-00124-CV, 2002 WL 31656109, at *3 (Tex. App.—Dallas Nov. 26, 2002, pet. denied) (not designated for publication) (although mediated settlement agreement "contemplated the drafting of 'more formal settlement documents,' releases, and dismissals, it did not provide the parties' agreement was contingent on or subject to the completion of any of these documents," and so the court held that the parties intended to be bound to the agreement as a matter of law); Restatement (Second) of Contracts § 27 (manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof).

Angel's next argument presents the key issue in the case. She contends that Tauch could not have accepted the offer because Tauch's power of acceptance terminated before he sent the April 13 email. According to Angel, South State Bank revoked its offer to settle by assigning its rights under the judgment to Angel, which terminated Tauch's power to accept the offer before he attempted to do so.

9

An offer may be made to a specified person, in whom is created a power of acceptance. *See Angelou*, 33 S.W.3d at 279; *Union Carbide Corp. v. Jones*, No. 01-14-00574-CV, 2016 WL 1237825, at *6 (Tex. App.—Houston [1st Dist.] Mar. 29, 2016, pet. denied) (mem. op.); Restatement (Second) of Contracts § 28. A contract cannot be created by acceptance of an offer after the power of acceptance has terminated. *See, e.g.*, *Figueroa v. Davis*, 318 S.W.3d 53, 68-69 (Tex. App.— Houston [1st Dist.] 2010, no pet.) (stating that, "[u]nder contract principles, once an offer is rejected, it is terminated, and the rejecting party cannot thereafter accept it"); *see also* Restatement (Second) of Contracts § 35(2). An offeree's power of acceptance may be terminated by, *inter alia*, revocation by the offeror. *See Kidwill v. Werner*, No. 10-05-00274-CV, 2006 WL 3627883, at *1 (Tex. App.—Waco Dec. 13, 2006, no pet.) (mem. op.); Restatement (Second) of Contracts § 36(1). An offeror may revoke an offer "at any time up to time of acceptance." *Peacock v. Harrison*, 189 S.W.2d 500, 503 (Tex. App.—Austin 1945, writ dism'd); *see also Bowles v. Fickas*, 167 S.W.2d 741, 743 (Tex. 1943).

An offeror may revoke an offer expressly and directly. *Kidwill*, 2006 WL 3627883, at *1. It is undisputed that South State Bank did not directly revoke or withdraw its offer to Tauch.

Rather, Angel argues that South State Bank "impliedly revoked" its offer, which terminated Tauch's power to accept the offer. An offer is impliedly revoked and the offeree's power of acceptance terminates when "'the offeree receives from the offeror a manifestation of intention not to enter into a contract,'"[1] or when "the offeror takes definite action inconsistent with an intention to enter into the

---

[1] *Kidwill*, 2006 WL 3627883, at *1 (quoting *Valencia v. Garza*, 765 S.W.2d 893, 896 (Tex. App.—San Antonio 1989, no writ)); *accord also Antwine v. Reed*, 199 S.W.2d 482, 485 (Tex. 1947).

10

proposed contract and the offeree acquires reliable information to that effect." *Id.* at *1; *see also* Restatement (Second) of Contracts § 43.[2]

According to Angel, South State Bank's assignment of its right to collect the South Carolina judgment, coupled with Tauch's receipt of a copy of the Assignment Agreement on April 13 before Tauch sent his acceptance email to Holden, constituted a definite action by the bank that was inconsistent with its prior intention to enter into a settlement with Tauch. The moment Tauch received notice of the assignment, Angel contends, his power to accept South State Bank's offer terminated—regardless of the assignment's effective date. Accordingly, Tauch had no power to accept the revoked offer, and therefore no settlement agreement exists.

Angel relies on two real-estate cases to support her point. In *Antwine v. Reed*, a bank sent a proposed land purchase contract to Reed. *See* 199 S.W.2d 482, 484 (Tex. 1947). Reed did not accept the contract until after Reed was advised of the bank's instruction to Reed's broker to take the land off the market, which it was argued amounted to notice that the bank revoked the proposed contract to Reed. *Id.* at 485. The Supreme Court of Texas agreed and held that the bank and Reed had no contract. Even when the offeror does not explicitly revoke its offer, the court said, "it [is] sufficient that the person making the offer does some act inconsistent with it, as, for example, selling the property, and that the person to whom the offer was made has knowledge of such [a]ct." *Id.*

---

[2] Implied revocation is a principle typically, if not exclusively, applied in real-estate cases. *See* Restatement (Second) of Contracts § 43 cmt. b ("The rule of this Section has been applied most frequently to offers for the sale of an interest in land."); *see also id.* Reporter's Note, cmt. c. ("No case not involving land has been found which follows the rule [of implied revocation]."). Tauch argues that we should not extend the implied revocation doctrine beyond the real-estate context. We will presume, without deciding, that implied revocation applies to the facts of this case.

11

In *Kidwill*, Werner, the owner of real property, was negotiating separately with Kidwill and Mast for the sale of the property. *See Kidwill*, 2006 WL 3627883, at *1. Kidwill made an offer to Werner. *Id.* Werner made a counteroffer to Kidwill. *Id.* While Werner's counteroffer was pending, Werner concluded a contract with Mast. *Id.* Kidwill conceded that he learned that Werner had accepted Mast's offer before Kidwill attempted to accept. *Id.* The court of appeals concluded that "there was [legally and factually sufficient] evidence that Werner impliedly revoked her counteroffer to Kidwill by concluding a contract with Mast, with Kidwill's knowledge, before Kidwill attempted to accept." *Id.* at *2.

We find these cases factually distinguishable from the matter at hand. In both cases, the offeror proposed a contract to an offeree but then entered into a contract with a third party as to the same subject matter before the original offeree accepted the earlier proposed agreement in all of its terms. The original offeree learned of the offeror's contract with the third party, or other acts inconsistent with the original offer, before the original offeree attempted to accept the outstanding offer. Thus, the original offeree knew that the offeror had taken action inconsistent with the outstanding offer and that would prevent the offer from materializing into a contract with the original offeree, because the offeror could not sell something that had already been sold to a third party. Here, in contrast, South State Bank and Angel did not have an effective contract at the time Tauch accepted; the Assignment Agreement did not become effective until April 14, the day after Tauch's acceptance. Because the Assignment Agreement was not effective until April 14, South State Bank had not yet assigned its interest in the judgment to Angel at the time Tauch accepted the bank's offer to settle.

12

Presuming the implied revocation doctrine applies in the present context, we conclude its elements are not met under applicable case law or Restatement sections 42 or 43. Tauch did not receive from the bank a manifestation of an intention not to enter into the proposed settlement agreement. Nor did the bank take definite action inconsistent with an intention to enter into the proposed contract with Tauch. The Assignment Agreement reflected on its face that it was not effective until April 14, the day after Tauch received it. No part of the Assignment Agreement became effective before April 14. A contract signed on April 13 but not effective until April 14 is no different than a contract signed on April 14 and effective at its signing. The fact that the bank entered into an assignment agreement that would not take effect until April 14 is not an action that would prevent the bank's April 11 offer to Tauch from materializing into a contract with Tauch should he accept the proposal before April 14, which he did. We conclude the Bank's April 11 offer to Tauch was not impliedly revoked. The parties agree that the bank's April 11 offer was never expressly revoked so Tauch had the power and the right to accept it before April 14. Because Tauch accepted South State Bank's offer before the Assignment Agreement's effective date, Tauch and the bank entered into a valid and binding settlement agreement.

Angel contends further that the Assignment Agreement's effective date is in fact April 13, not April 14, by operation of the Clarification Agreement. We cannot credit this contention. Parties cannot make a contract retroactively binding to the detriment of a third party. *See, e.g.*, *Crowell v. Bexar County*, 351 S.W.3d 114, 118-19 (Tex. App.—San Antonio 2011, no pet.) (noting "general rule" that "parties to a contract cannot make the contract retroactively binding to the detriment of third persons"); *see also* Williston on Contracts § 6:61 (parties may agree to give a contract a specific effective date, except to the extent doing so

would injure a third party's rights); Restatement (Second) of Contracts § 155 ("Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected."); *accord also Ranger Ins. Co. v. Ward*, 107 S.W.3d 820, 827-28 (Tex. App.—Texarkana 2003, pet. denied) (parties' retroactive release after notice of a loss was void as contrary to public policy when the contracting parties entered the contract to escape liability to an injured third party).

We hold that Tauch's April 13 email constitutes an acceptance of South State Bank's offer as a matter of law.

### 3. *Did South State Bank and Tauch agree to all essential terms?*

We next consider whether Tauch conclusively established a meeting of the minds on all material terms. To form a binding contract, an offeror and offeree "must agree to the same thing, in the same sense, at the same time." *Angelou*, 33 S.W.3d at 279. The material terms of a settlement agreement include consideration and a specification of liability or claims to be released. *MKM Eng'rs*, 476 S.W.3d at 781-82; *Padilla v. LaFrance*, 907 S.W.2d 454, 460-61 (Tex. 1995) (material terms of settlement agreement include consideration and release of claims). Both Holden's offer and Tauch's acceptance stated that South State Bank would release Tauch's judgment for $2 million, which are the essential terms of the parties' settlement agreement. *See MKM Eng'rs*, 476 S.W.3d at 781-82.

Angel contends that the parties omitted key material terms from their emails, and therefore they did not achieve a settlement agreement. According to Angel, the following terms are missing or incomplete: (a) whether Tauch's acquiescence

14

to a $2 million dollar payment matches the $2 million "net proceeds" identified by Holden's April 11 email; (b) when payment must be made; (c) the form of the payment; (d) the form and scope of the release; and (e) the substance of the final settlement agreement. None of these allegedly missing or incomplete terms are material or necessary to enforce the settlement agreement as documented by the emails.

First, Holden's email specified that the consideration would be $2 million in "net proceeds." Tauch's email does not mention "net proceeds," but it does agree to the $2 million payment. Tauch's email does not contradict or vary from the terms of Holden's offer. The parties therefore agreed to the material term of consideration. *Accord, e.g.*, *Amedisys*, 437 S.W.3d at 514 (an immaterial variation between the offer and acceptance will not prevent the formation of an enforceable agreement) (citing *United Concrete Pipe Corp. v. Spin-Line Co.*, 430 S.W.2d 360, 364-65 (Tex. 1968) (holding that change in pricing terms from "contract price" to "unit price" did not "change the legal effect of the language" and thus was not material and did not prevent formation of an enforceable contract)). There is but one reasonable reading of the emails insofar as the consideration amount: the parties agreed the consideration would be $2 million.

Second, neither the timing nor the form of Tauch's payment is a material term. *See Love v. Harrison*, No. 14-16-00632-CV, 2017 WL 3567868, at *7 (Tex. App.—Houston [14th Dist.] Aug. 17, 2017, no pet.) (mem. op.) ("Texas courts hold that time of performance such as the time of payment of a settlement amount is not an essential term because time ordinarily is not of the essence in a contract."); *Eastman Gas Co., L.L.C. v. Goodrich Petroleum Co., L.L.C.*, 456 S.W.3d 319, 329 (Tex. App.—Texarkana 2015, pet. denied) ("Under the facts of

15

this case, the manner of payment and the amount and rate of interest are not essential terms.").

Finally, the form and scope of the final settlement agreement and release are not material terms. *See MKM Eng'rs*, 476 S.W.3d at 779 ("[A]lthough appellants complain that the terms of the releases were not spelled out and had yet to be drafted, the Rule 11 Agreement identified the specific parties and claims that would be released, as well as the claims to be excluded from the releases.").

\* \* \*

Holden's April 11 email is an offer that Tauch accepted, and the parties agreed to the material terms of the settlement agreement. The remaining contract elements are conclusively established in the record and not challenged by Angel. Thus, Tauch established as a matter of law that a legally enforceable settlement agreement exists. The trial court erred in granting Angel's motion for summary judgment based on the principle of implied revocation and in denying Tauch's motion for summary judgment. We therefore sustain Tauch's first, second, and third issues and render judgment that the bank and Tauch reached a valid agreement on April 13 to settle the judgment for $2 million.

## C.    Attorney's fees

In his fourth issue, Tauch seeks rendition of judgment in his favor regarding his entitlement to attorney's fees. The trial court awarded Angel and South State Bank trial attorney's fees, conditional appellate fees, costs, and interest. The court provided, however, that in the event that Tauch ultimately prevails following the conclusion of any appeals, he is entitled to recover his fees and costs. The parties stipulated to the amounts of trial and conditional appellate attorney's fees to which they are respectively entitled.

16

We reverse the portion of the final judgment that awards Angel and South State Bank their fees, costs, and interest. We render judgment for Tauch on the parties' competing claims for declaratory judgment and render judgment that Tauch recover his trial attorney's fees, costs, interest in the trial court, and attorney's fees for representation in the court of appeals, in the amounts stipulated by the parties and reflected in the trial court's judgment.

We sustain Tauch's fourth issue.

## Conclusion

We hold that South State Bank and Tauch entered into a legally enforceable settlement agreement. We reverse the trial court's rulings on the parties' cross-motions for summary judgment, as well as the award of fees, costs, and interest to Angel and South State Bank. We render judgment for Tauch on the parties' competing claims for declaratory judgment. We render judgment that Tauch recover from Angel and South State Bank, jointly and severally, his attorney's fees, costs, and interest. We remand the case to the trial court for proceedings consistent with this opinion.

/s/    Kevin Jewell
         Justice

Panel consists of Chief Justice Frost and Justices Jewell and Bourliot (Frost, C.J., dissenting).